# Washington Avenue.

1. An act was passed incorporating commissioners to make an artificial
road seven miles long, mainly through agricultural land near Pittsburg and
through a number of townships, the cost to be paid by assessment on lands
within different distances from the road, whether abutting on the road or
not; some of the owners of taxed lands did not travel on the road.   A mas-
ter found that all the taxed persons, and many out of the limits of taxation
would be benefited, those on the road most, and that it would be a general
public benefit.  *Held*, that the assessment was unconstitutional as being a
local assessment for a general public benefit.

2. The power of taxation by the legislature is not limited in the Constitu-
tion, and is bounded only by the necessities of the state or the will of the
people.

3. Taxation does not fall within the power of eminent domain; that only
by a direct taking of property for public use.

4. The legislature may enact a law providing a just assessment on proper
objects according to benefits conferred, and not imposing unfair and unequal
burdens.

5. Assessing a tax to pay for streets, &c., in towns in proportion to the

[Washington Avenue.]

frontage on the street, is a reasonable exercise of the taxing power according to the benefits received.

6. Such rule of taxation applies only to cities and large towns, where, from the density of the population, and the small size of the lots, there is a reasonable certainty of arriving at a true result.

7. The power of the legislature as to local taxation, discussed.

8. Hammett v. Philadelphia, 15 P. F. Smith 155, McMasters v. Commonwealth, 3 Watts 292, remarked on.

October 12th 1871. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the decree of the Court of Common Pleas of *Allegheny county*: In Equity: No. 172, to October and November Term 1870.

On the 7th of June 1841, the legislature incorporated the Coal Hill and Upper St. Clair Turnpike Road Company, to make an artificial road from near the top of Coal Hill, in Allegheny county, about one and a quarter miles from south end of the Monongahela bridge at Pittsburg, in a direction towards Canonsburg, in the county of Washington; the road to be ten miles in length, reserving power to the legislature to resume the franchises of the company should the road not be commenced in two years and completed in ten years. This act was continued in force by the Act of March 6th 1847. By the Act of March 22d 1850, the company were authorized to make a plank-road on any part of their line. By resolution of the managers of the company, April 24th 1850, they gave over to the supervisors of Scott township (through which the road passed) about three miles of their road which had been graded; and by Act of April 15th 1869, the legislature repealed the law incorporating the company and its supplements, and annulled its charter.

By Act of the 3d of May 1870, the legislature enacted that the name of the road known as the "Coal Hill and Upper St. Clair Turnpike Road," should be "Washington Avenue." It appointed John Gilfillan and others commissioners of said avenue, and created them a corporation. It further enacted that the qualified electors of Pennsylvania owning property situate within three-quarters of a mile on either side of the avenue for a part of it designated; within one mile for another part; within a mile and a half for another part, should within thirty days after the passage of the act elect commissioners to serve for a year.

Section 4 enacted, that in order to provide means wherewith to grade, macadamize and put said Washington avenue as speedily as possible in good order, repair and condition, the commissioners should "assess and collect, in the nature of a special tax," $6 per acre or fractional part, within half a mile of the avenue on parts specified; $4 on each acre, &c., within half a mile on other parts; $3 on each acre, &c., within three-quarters of a mile on other parts, to be assessed and collected by the commissioners in the

19 P. F. SMITH—23

[Washington Avenue.]

same manner tnat road-taxes are collected; coal and minerals owned by persons who were not owners of the surface not to be taxed; and if the taxes should not be paid within ninety days, a lien to be entered for the amount against the real estate to be enforced as taxes on unseated lands.

Section 6 required the commissioners to grade and macadamize the avenue in a substantial manner, to appoint a superintendent to keep it in repair, and to appoint toll-collectors.

Section 7 required that the road-tax assessed by the township authorities on property abutting on the avenue should be paid to the commissioners, and applied to its construction and maintenance.

Section 9 authorized the commissioners, on the completion of the road, to collect tolls from travellers at rates named.

Section 10 enacted, "That an account be kept with all persons owning and residing upon property situate either in whole or in part within the limits prescribed in the third section of this act, contributing by the assessment prescribed in the fourth section, for the construction of said avenue in which each person shall be credited with the amount of his assessment, and shall be debited with the amount of toll chargeable from time to time to himself, family and employees, and when the amount of his said tolls shall be equal to the amount of his assessment, he shall thereafter be required to pay tolls in cash in the same manner and amount as hereinbefore prescribed for other persons using said avenue."

Section 14 enacted, "That all moneys received by the treasurer shall be applied to the construction and repair of said avenue; and if any surplus remains in their hands, the said commissioners, in their discretion, may apply the same to the repairs of any roads leading into said avenue."

The electors authorized by the act, on the 1st day of June 1870, elected John Gilfillan and others commissioners.

On the 9th of July 1870, Ann Curran and others, owners of land within the limits set out in the 4th section of the act, whose lands do not abut on the avenue, filed a bill against "The Commissioners of Washington Avenue," and John Gilfillan and others (the commissioners) by name.

The bill set out the foregoing Acts of Assembly; that the plaintiffs were owners of land in the quantities which they specified in the bill, varying between 30 to 200 acres each; that a tax had been assessed by the commissioners on their land, and the enforcement of its collection was threatened by the commissioners; that they, and others assessed with the tax, did not use Washington avenue, but used other parallel roads; that they are liable for road tax, under the general road laws, for other roads both within and outside of the limits for which the tax is assessed for Washington avenue.

[Washington Avenue.]

The prayers of the bill were, that the Act of 1870 should be declared unconstitutional, as a whole, or so far as it authorized the levy of the tax, or so far as it authorized the levy of the tax on the plaintiffs' lands, for an injunction, and for general relief.

They afterwards amended their bill by leave of the court, by averring that the improvement of Washington avenue would be for the general benefit, and that the entire cost could not constitutionally be imposed on the lands within the limits designated in the act; that the improvement would greatly benefit persons owning lands in the immediate vicinity of the avenue, but outside the limits of the taxation; and that those within the limits of taxation could not be constitutionally taxed to the exemption of others in the immediate vicinity largely benefited by the improvement; that the benefit from the improvement to land in the vicinity, whether within or without the limits of taxation, would be unequal, and that if it was a local improvement, the taxation should be apportioned in proportion to the benefits received.

The answer of the defendants averred, that both under the original acts and when the road was in care of the supervisors, it had always been in a bad condition; that the improvement of the territory through which the "Old Washington road" supplied by the avenue passes, and which is adapted to agriculture, is much retarded for want of a good road; that the avenue would enhance the value of all real estate within the limits of the taxation, and would be of great public benefit. They accompanied their answer with a list of seventy-eight persons within the limits of the special taxation, but not abutting on the avenue, and owning about 3000 acres of land, "favoring the proposed improvement"; they averred that all the complainants, except three or four, used the line of the proposed avenue, and also will be greatly benefited by the improvement, and that their land will be enhanced in value from 25 to 100 per cent.

A replication was filed, and James A. Lowrie, Esq., was appointed examiner and master.

Mr. Lowrie, in his report, stated that "Washington Avenue," so far as it went, was located on the Washington state road, running from Pittsburg to Washington, a distance of twenty-five miles; the northern terminus of Washington avenue is one mile and a half from the Monongahela bridge at Pittsburg; its length is seven miles fifty-four rods; its southern terminus is about two miles from the Washington county line; the limits of taxation, under the Act of 1870, are from half a mile to a mile distant from the avenue; a number of roads, specified in the report, diverge from the southern terminus of Washington avenue and lead to towns and boroughs mentioned in the report; a very large amount of the travel from Washington county (the limits being specified in the report), would be greatly benefited by a macadamized road, for the extent of the line of Washington

avenue; and the land in Washington county, within those limits, would be as greatly enhanced in value as lands within the limits of the special taxation; the same would be the effect on lands (designated) in Allegheny county. The greatest amount of benefit would accrue to lands abutting on the avenue, but the benefit would extend to lands for three miles distance from the avenue, whether within or without the limits of the taxation; the enhancement in value, according to location, &c., would vary from 15 per cent. to 100 per cent.; the road on which Washington avenue was to be located is very bad—in winter and spring almost impassable. The report then designated a number of roads running from the northern terminus of the avenue, and found that the avenue would benefit a number of boroughs which are named, and also the cities of Pittsburg and Allegheny, also that it would be a general public benefit; the tax was estimated at $46,000. A number of the complainants used the avenue, a number did not use it at all, and others used it occasionally. "The Coal Hill Road" was graded to the extent of four miles; but the company were not able to macadamize it, as provided by the charter, and the tolls not being sufficient to keep it in repair, it had been almost impassable for travellers; the tolls would not keep the road in repair, the part improved was abandoned to the township supervisors in the spring of 1865, and it had since been taken charge of by the supervisors; had been somewhat repaired by them, but for a number of years had been in an almost impassable condition; the land through which the avenue would pass is adapted to agriculture, abounds in bituminous coal, and its improvement is much retarded for want of a good road; the avenue would enhance the value of all real estate within the limits of the proposed taxation, and also without the limits in localities specified in the report, and would also be a great public benefit. - The concluding paragraph of the report was as follows:—

"All the property lying within the limits of taxation for the improvement of Washington avenue, whether the owners will use the road or not, will be enhanced in value, from 20 per cent. to 100 per cent., if said improvement shall be made as contemplated by the act establishing the avenue, and such enhancement will vary according to the size of the farm, its location and facility of access to the avenue."

On the 14th of September 1870, the court (Stowe and Collier, JJ.) decreed an injunction against the commissioners, restraining them from collecting the tax under cover of the Act of 1870.

The commissioners appealed to the Supreme Court, and assigned the decree for error.

*C. S. Fetterman*, for appellants.—The legislature may tax a class of lands, or persons benefited: The People *v.* Mayor, &c., of

[Washington Avenue.]

Brooklyn, 4 Comstock 430; Hancock Street, 6 Harris 26; Commonwealth v. Woods, 8 Wright 113; Philadelphia v. Tryon, 11 Casey 401; Stroud v. Philadelphia, 11 P. F. Smith 255. To make a tax law unconstitutional on this ground, it must be apparent at first blush that the community taxed can have no possible interest in the purpose to which their money is to be applied: Sharpless v. Mayor of Philadelphia, 9 Harris 148. Equality of contribution is not enjoined in the Bill of Rights. Kirby v. Shaw, 7 Id. 260. The taxing power by the legislature must become so grossly perverted as to lose the character of a legislative function before the judiciary can interpose on constitutional grounds: Schenley v. City of Allegheny, 1 Casey 130; Commonwealth v. Woods, 8 Wright 113; Grim v. Weissenbergh School District, 7 P. F. Smith 437.

*M. W. Acheson* (with whom was *N. W. Shafer*), for appellees.— The plaintiffs have the right to test in equity the validity of the act: Kerr v. Trego, 11 Wright 292; Mott v. Penna. Railroad Co., 6 Casey 9; Page v. Allen, and Robb v. Barlow, 8 P. F. Smith 338. This act would make the appellees corporators, without and against their consent. The government cannot incorporate persons, even for their own benefit, without the consent of such persons: Ang. & Ames on Corp., § 81. They cited Hammett v. Philadelphia, 15 P. F. Smith 155.

The opinion of the court was delivered, January 9th 1871, by

AGNEW, J.—This case presents a new question upon the power of taxation: the authority of the legislature to compel the owners of farm lands, lying within one mile on each side of a public highway, to pay for grading, macadamizing, and improving it, by an assessment upon their lands by the acre. It is not a case of municipal taxation by a county, township, city or borough, for local improvements. The law created a corporation of seven commissioners to take charge of the avenue, make the improvements, lay and collect the taxes, and provide for the collection of tolls for its use. The road has no respect to township authorities, township lines, or the mode of levying township taxes. It is not the case of taxation by frontage, for the lands of the plaintiffs in the bill do not abut upon the avenue, but merely lie within the prescribed lines of taxation. It is not a case of local improvement, and taxation therefor, upon those exclusively, or even those peculiarly benefited; for the master finds that some of the plaintiffs do not use the avenue, but travel on parallel roads, that persons two miles outside, and on each side of the lines of taxation are nearly, or quite, as much benefited as those within these lines, and that owners of property and the public, far beyond the southern terminus of the avenue in the direction of Canonsburg

[Washington Avenue.]

and Washington are greatly benefited. In short, he finds that the proposed improvement will be *a general public benefit.*

Washington avenue is but seven miles long, passing through six townships and part of a seventh; but if this mode of taxation, to grade, macadamize and improve it, can be maintained, the legislature, on the same principle, can make a turnpike, a canal, a railroad, or any other highway across the.state, and compel the owners of lands within one, or any fixed number of 'miles, to pay for it, and can assess the cost per acre, not only at $6, $4 and $3 per acre, as in this law, but at sixty, forty, thirty, or any number of dollars, necessary to build the highway. If this be legitimate taxation, it has no bounds, for it must be conceded that the power of taxation, properly so called, has no limit in the Constitution, and is bounded only by the necessities of the state or the will of the people.

The practice of municipal taxation by counties, townships, cities and boroughs for local objects, had its origin in necessity and convenience. Hence roads, bridges, culverts, sewers, pavements, school-houses, and like local improvements, are best made through the municipal divisions of the state, and paid for by local taxation. These have always been supported as proper exercises of the taxing power. Nor is this mode of taxation inconsistent with our notions of the right of private property and of the equality of burdens; for each municipality in its turn (sooner or later) by a tax on all its inhabitants pays only for what it makes and enjoys within its own limits, and thus in the course of time the burthen is equalized upon all, as every portion of the state makes its own improvements and enjoys their peculiar benefits. This practice was followed by another advance in the local mode of taxation. In cities and towns where population was dense the authorities began to make improvements of special advantage to certain of the citizens at their expense; such as footwalks in the front of dwellings, and pavements in those streets which were well built up, and where good carriage-ways were needed. Here, too, though a step far in advance of the system of general taxation, our notions of private right were not violated; for the advantages to the owners were so clear in the promotion of their convenience, and the enhanced value of their lots, caused by improved footwalks and carriage-ways, that the burthen was duly compensated, and again equality was produced as each street or alley came to be paved. So far, public opinion and ancient and long-continued legislative practice have sustained local taxation with great unanimity, and this is strong evidence of the true interpretation of the constitutional power of the legislature to authorize municipal taxation of this sort. Indeed, the general acquiescence of the people in this exercise of the power is so clear, that few

cases are to be found in the books, wherein any question has been made upon the power itself.

In two cases, coming under my notice, it was said that a municipal assessment upon property subjected to payment for local improvements, is not a tax: Pray v. Northern Liberties, 7 Casey 69; The Borough of Greensburg v. Young, 3 P. F. Smith 280. Technically the statement is true when we speak of a tax as ordinary revenue, but it is clear that in neither case it was meant to say, that such an assessment is not taxation within the general legislative power to tax, but only that it was not a tax within the Acts of Assembly requiring certain things to be done prescribed in the case of ordinary taxation for revenue. Had it been meant to say that such an assessment is not taxation at all, it would, in effect, deny the power of the legislature to authorize the assessment, a power which was affirmed in both of these cases.

In order to take the money or effects of the citizen and apply them to public uses, beside the power of taxation, I know none other than that of eminent domain. But such an assessment does not fall within the latter, for eminent domain acts only by a direct taking of the property for a public use, and by way of a compensation for the taking, in obedience to a constitutional injunction forbidding the property of the citizen to be otherwise taken. The power of taxation and eminent domain have always been clearly distinguished.

Next came another step forward in the exercise of the power of local taxation, but one more doubtful, and at first view not so easily perceived to be within the legislative power; that is to say, the assessment of the property of one man to pay the compensation due to another whose property has been taken for a public use. Here the right to assess seems to be further removed from the true source of the power, and it is more difficult to discern the liability of the few to pay what the state herself seemingly should pay by general taxation, for property taken under the power of eminent domain.

In consequence of this doubt the question was presented to this court in the case of McMasters v. The Commonwealth, 3. Watts 292. There the property of Nancy Knox and others was taken for the purpose of making a new street from the Diamond to Fifth street, in the city of Pittsburg, and their compensation ascertained by a jury of freeholders.

The McMasters lot was then assessed with a part of the compensation in proportion to the benefits found by the jury to be conferred upon the lot by the opening of the adjoining new street. The eminent counsel of McMasters, the late Judge Forward, seems to have considered the assessment of his property as an exercise of the power of eminent domain, and denied its validity upon the ground that the act proposed to take his property, or at

[Washington Avenue.]

least his money, and to compensate him in benefits. This he contended the legislature could not do, but must compensate him in money, citing Vanhorne *v.* Dorrance, 2 Dallas 315, on this point.

Justice Rogers, however, denying the authority of Vanhorne *v.* Dorrance, held that compensation under the Constitution need not necessarily be in money, but may be in whole or in part by actual benefits conferred; instancing the numberless turnpike and canal laws (to which railroad acts may be added), in which the viewers. in estimating damages are required to take into consideration the advantages accruing to the landowner. And when he comes to consider the question as to the assessment on McMasters's lot, he admits that it is a new feature in our legislation, yet thinks the principle not new : citing Livingstone *v.* The Mayor of New York, 8 Wend. 85. But what the precise principle is he does not very distinctly define, though in the main he seems to derive it from the power of local taxation for benefits received. It appears to me, when closely examined, this is its only true source. It is simply a new development of that principle of local taxation beforementioned as undisputed, which assesses on the property benefited or its owner, a tax in proportion to the superadded value of the property, caused by the local improvement of which this property has a peculiar advantage beyond that of others not in like circumstances. For if we analyze the transaction, we shall find that the compensation paid to Mrs. Knox and others for their property taken to make the new street, is a thing wholly distinct from, and independent of, the money paid by McMasters. The assessment upon him is not simply by way of taking his money to pay them, but was by way of an assessment upon him for the benefits he received from· the improvement. His money, it is true, passes directly into their compensation, but this is merely to avoid circuity of payment, by an immediate appropriation of his tax. In principle, therefore, it is an independent transaction, and is the same thing as the money paid by an abutting lot-owner for the pavement before his door, into the public treasury, and thence paid out to the paver of the street. Yet in that case what difference would it make were the money of the abutting lot-owner appropriated directly to pay the paver ? provided his assessment be made on the principle of his paying according to his proportional benefit. Indeed, this is nearly the present system of paving streets in Philadelphia. The exercise of this power of assessments for benefits (as before remarked) is not by way of eminent domain, in the usual sense of this term, for it is not a taking at all, followed by compensation for the taking; but it is a special mode of taxation, which equalizes burdens, by a counterbalance of benefits, whereby those benefited more pay more, and those benefited less pay less It is thus special as contradistinguished from general taxation, but not special as making one man to pay all or more than his

just proportion of a common burden.   General taxation pays no
regard to equality of burden, further than to lay the tax in pro-
portion to the amount of the assessable property of each tax-payer,
throwing out of view all questions of special benefit.   So long,
therefore, as the benefits of each tax-payer are justly and impar-
tially assessed under the special system, I cannot see that the
general system is more just or impartial.   Indeed, if faithfully
executed the special system seems to be more equal and just, for,
under the general system, some may be greatly benefited more
than others, and yet pay but a small proportion of the tax, con-
sidering what they receive.   For example, a poor man may send
many children to school, while a man of large property, having
none to send, may pay a large tax—and a man being greatly be-
nefited by a public road may pay a very small proportion of the
tax which keeps it up.

Taxation, according to benefits received, is neither unequal nor
unjust, and cannot, therefore, come into conflict with those clauses
in the Bill of Rights, which regard as sacred the right of private
property.   So long, therefore, as a law faithfully and reasonably
provides for a just assessment according to the benefits conferred,
and does not impose unfair and unequal burdens, it cannot be
said to exceed the legislative power of taxation, when exercised
for proper objects.   It is on this ground only that assessment
according to the frontage of property on a public street to pay
for its opening, grading and paving, is to be justified.   As a prac-
tical result, in cities and large towns, the per-foot front mode of
assessment reaches a just and equal apportionment in most cases.
Hence this mode has been deemed a reasonable exercise of the
taxing power in such places, with a view to taxation according to
the benefits received.   Whatever doubt might have been originally
entertained of it as a substitute, which it really is, for actual
assessment by jurors or assessors under oath, it has been so often
sanctioned by decision, it would ill become us now to unsettle its
foundation by disputing its principle.   But it is an admitted sub-
stitute, only because practically it arrives, as nearly as human
judgment can ordinarily reach, at a reasonable and just appor-
tionment of the benefits on the abutting properties.   Hence the
fairness of the rule of charging benefits by frontage was a con-
ceded point in Hammett v. The City of Philadelphia, 15 P. F.
Smith 155.   But this rule, as a practical adjustment of propor-
tional benefits, can apply only to cities and large towns, when the
density of population along the street, and the small size of lots,
make it a reasonably certain mode of arriving at a true result.

To apply it to the country and to farm-lands would lead to such
inequality and injustice as to deprive it of all soundness as a rule,
or as a substitute for a fair and impartial valuation of benefits in
pursuance of law ; so that at the very first blush, every one would

[Washington Avenue.]

pronounce it to be palpably unreasonable and unjust. Judged of by this rule for deciding in a question of constitutional power, the law in this case cannot stand.

Whether we view this avenue as a macadamized highway, seven miles long or three hundred, the result is the same to those along its route. To charge its cost upon the farms lying within one mile on each side at a fixed sum per acre, is so obviously onerous and unreasonable, and leads to such a destruction of private right, and such unfairness of imposition for the advantage of the public at large, and of individuals who pay nothing, it cannot, on any fair principle of reasoning, be said to be a valuation according to benefits. In other words, it cannot with any degree of truth be pronounced to be a proper substitute for a just and impartial valuation of benefits. This needs no reasoning to make it plainer than the proposition presents itself to the mind the moment it is stated. If unreasonable and not a fair substitute for a valuation made by a disinterested tribunal, acting according to the law of the land, then it plainly is not within the principle of the many decisions, in this and other states, recognising the per-foot frontage rule as a fair mode of measuring the benefits, and is consequently not a legitimate method of assessment upon the adjacent farm-lands. I admit that if we do not analyze the reason and trace the origin of the frontage rule, there is a seeming analogy between the Washington Avenue Act and many preceding it for the improvement of streets in cities and towns.

But reasoning by analogy is sometimes a dangerous source of error, and is always so, if we·fail to see that the analogy itself is accurate. In the present case, an examination of the facts in which the per-foot frontage rule is based, discloses at once the want of analogy between large farms with single occupants or owners, or wild or untenanted land, in the country, and the small lots of a crowded street in a populous town. The legislature therefore made a mistake in fixing such a burden upon the lands along the route of this avenue. It is in fact nothing more than a law to coerce certain landowners to pay for a public improvement in which their interest is no greater, and as to some of them not so · great, as that of many others who pay nothing; and it offends against the clear intent and spirit of the Bill of Rights. There is no case in our books, wherein the legislative power to tax has been maintained with greater vigor and ability than Sharpless v. The City of Philadelphia, 9 Harris, yet even there, the then Chief Justice admits (p. 166), that the exercise of the power may be forbidden by clear implication, as well as express restriction. " It is not every act the legislature may choose to call a tax-law that is constitutional." " The whole public burden," he contends, " cannot be thrown upon a single individual, under pretence of taxing him." This is a concession that taxation has a limit *per*

[Washington Avenue.]

*se*, and is not always co-extensive with legislative exaction. When, therefore, the Constitution declares in the ninth article, that among the *inherent* and *indefeasible* rights of men is that of acquiring, possessing and protecting property,—that the people shall be secure in their *possessions*, from *unreasonable* seizures,—that no one can be *deprived* of his *property* unless by the judgment of his peers, or the law of the land—that no man's *property* shall be taken or *applied* to public use without *just compensation* being made—that every man for an injury to his *lands or goods* shall have remedy by *due course of law*, and *right* and justice administered without sale, denial or delay—and that no law impairing contracts shall be made—and when the people, to guard against transgressions of the high powers delegated by them, declared that these rights are excepted out of the general powers of government, and shall for ever remain inviolate, they, for their own safety, stamped upon the right of private property, an inviolability which cannot be frittered away by verbal criticism on each separate clause, nor the united fagot broken, stick by stick, until all its strength is gone.

There is a clear implication from the primary declaration of the inherent and indefeasible right of property, followed by the clauses guarding it against specific transgressions, that covers it with an ægis of protection against all unjust, unreasonable and palpably unequal exactions under any name or pretext. Nor is this sanctity incompatible with the taxing power, or that of eminent domain, where for the good of the whole people, burdens may be imposed or property taken.

I admit that the power to tax is unbounded by any express limit in the Constitution—that it may be exercised to the full extent of the public exigency. I concede that it differs from the power of eminent domain, and has no thought of compensation by way of a return for that which it takes and applies to the public good, further than all derive benefit from the purpose to which it is applied. But nevertheless taxation *is* bounded in its exercise by its own nature, essential characteristics and purpose. It must therefore visit all alike in a reasonably practicable way of which the legislature may judge, but within the just limits of what is taxation. Like the rain it may fall upon the people in districts and by turns, but still it must be public in its purpose, and reasonably just and equal in its distribution, and cannot sacrifice individual right by a palpably unjust exaction. To do so is confiscation, not taxation, extortion not assessment, and falls within the clearly implied restriction in the Bill of Rights.

It is found by the master, and if it had not been found by him, it is perfectly obvious, that this avenue will be one of general public benefit; and specially that it will be of great convenience

and individual benefit to citizens and taxpayers, beyond the limit of taxation along the road, both laterally and terminally.

Indeed, beyond its southern terminus its benefits reach a considerable distance into the county of Washington. This brings it within the principle of Hammett *v.* The City of Philadelphia, *supra ;* expressed in these words, at the conclusion of the opinion of our brother Sharswood : "Local assessments can only be constitutional when imposed to pay for local improvements, clearly conferring special benefits on the properties assessed, and to the extent of these benefits. They cannot be imposed when the improvement is either expressed, or appears to be, for general benefit." I concurred in that opinion, and I see no reason to regret my concurrence; but on the contrary, I see in the present case much to confirm it; and the examination I have just made into the power of special taxation, it seems to me, tends to confirm and strengthen what was so well reasoned in Hammett *v.* The City. Indeed I consider it a fortunate circumstance that that case came up, for it led to an inquiry into the power of special taxation, which was in danger of running wild by insensible degrees, and leading, before we had become aware of it, into the exercise of a bastard power, dangerous to the right of private property, and violative of the provisions in the Bill of Rights, placed there for its protection. In questions of power exercised by agents, it is sometimes the misfortune of communities to be carried, step by step, into the exercise of illegitimate powers without perceiving the progression, until the usurpations become so firmly fixed by precedents, it seems to be impossible to recede or to break through them." The majority opinion in that case did not then, and this opinion does not now, dispute the long-recognised power of local taxation for local improvements, according to the benefits conferred; but they meet and dispute departures from that power, which if recognised, will land in the overthrow of the right of private property. Laws which cast the burdens of the public on a few individuals, no matter what the pretence, or how seeming their analogy to constitutional enactments, are in their essence despotic and tyrannical, and it becomes the judiciary to stand firmly by the fundamental law, in defence of those general, great, and essential principles of liberty and free government, for the establishment and perpetuation of which the Constitution itself was ordained. Should we now suffer this law to pass without judicial criticism and condemnation upon a false analogy of the frontage rule in cities and large towns, we should leave open a door for future impositions upon private property, so wide and specious, errors the most odious and of enormous proportions would enter in.

For these reasons the decree below is affirmed.