## Alco Parking Corporation, et al. *v.* City of Pittsburgh.

Argued February 22, 1972, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT. Reargued September 11, 1972.

*Leonard Boreman,* with him *Richard H. Martin* and *Baskin, Boreman, Sachs, Wilner, Gondelman & Craig,* for appellants.

*Leonard M. Marks,* with him *Gold, Farrell & Marks,* for appellant Meyers Bros. Parking-Central Corporation.

*Frederick A. Boehm,* First Assistant City Solicitor, with him *Ralph Lynch, Jr.,* City Solicitor, and *Grace S. Harris,* Special Assistant City Solicitor, for appellee.

OPINION BY JUDGE ROGERS, June 8, 1972:

The City of Pittsburgh in December 1969, pursuant to The Local Tax Enabling Act of December 31, 1965, P. L. 1257, 53 P.S. §6901, *et seq.,* enacted an ordinance imposing upon all parking transactions of operators of nonresidential parking places a tax at the rate of twenty per centum of the gross receipts from such transactions received during the year commencing February 1, 1970 and thereafter. The city has imposed a tax identical except as to rate since the year 1962, the ordinance imposing such prior to the year 1965 having been imposed under the Act of June 25, 1947, P. L. 1145, 53 P.S. §6851, repealed and replaced by the Act of December 31, 1965, P. L. 1257. Under said ordinances the tax has been increased from ten per centum in 1962 to fifteen per centum in 1968 and by the ordinance here under attack to twenty per centum.

The appellants, parking lots operators, here sought in equity to restrain the city from enforcing the twenty

per centum ordinance effective February 1, 1970. The court below, after trial on the merits, made an adjudication *nisi* dismissing the complaint and, after exceptions filed and dismissed, a decree that its adjudication *nisi* should be entered as a final decree. This appeal followed.

The subject of municipal taxes upon the gross receipts of parking lot transactions has been the subject of considerable litigation. All save one of the appellants' contentions here have been conclusively decided against them, and we will not burden this opinion by a lengthy repetition of the reasoning of such definitive holdings.

The appellants suggest that under the equal protection clause of the Fourteenth Amendment of the United States Constitution and uniformity clause of Article VIII, Section one[1] of the Constitution of Pennsylvania, their business may not be singled out for this tax. Their fire comes from two barrels: first, that there is no rational basis for distinguishing the commercial parking business from other businesses and second, that there is no such basis for distinction between nonresidential and residential parking. Unfortunately for the appellants the targets at which they aim have been long since removed from the range. In *Philadelphia v. Samuels,* 338 Pa. 321, 12 A. 2d 79 (1940), the Supreme Court upheld for the purpose of a tax identical to that in the instant case by implication a classification of parking lots as distinguished from other businesses and explicitly the classification of open parking lots as distinguished from closed parking lots, writing: "Another contention is that the ordinance is bad as discriminating against open parking lots in favor of closed

---

[1] The appellants, Alco Parking Corp., et al., refer, we assume by inadvertence, to Art. IX, Section 1, the place where the so-called uniformity clause was, prior to 1968, located.

garages engaged in parking. It has not been shown that the municipal legislature did not have reasonable ground for separating open parking lots from closed garages and placing them in separate classes for the purpose of taxing the parking transaction in the open lot. The growth of such parking in recent years is [a] matter of common knowledge of which the courts take notice. Generally, the operation of such lots involves more extensive use of sidewalk and street than is involved in the operation of the closed garage; land occupied by a closed garage is assessed at the value of land and buildings, whereas the open parking lot is assessed without buildings or buildings of negligible value. Other elements of the same general character suggest themselves. In such circumstances the court cannot say that the municipal authorities had not sufficient reason for the classification." 338 Pa. at 326, 327, 12 A. 2d at 82. In *McGillick v. City of Pittsburgh,* 415 Pa. 581, 203 A. 2d 480 (1964), the Supreme Court affirmed *per curiam* an order of the Allegheny County Court specifically upholding the city's classification, continued in the present ordinance, of commercial parking places as taxable and residential as not subject to levy. Finally, on this point, lacking better expression of our own devising, we quote from *Commonwealth v. Lafferty,* 426 Pa. 541, 550, 233 A. 2d 256, 261 (1967), where the classification upheld was that of taxable non-public utilities as distinguished from excluded public utilities. Mr. Justice EAGEN there wrote: "Further, it is in the context of the whole Sales and Use Tax statute that we must view the exclusion. Since this statute is one designed to raise revenue, the state need not justify any distinction drawn between the taxed and the non-taxed 'so long as some other reasonable basis for treating the various classes differently exists. Where such distinction exists, the wisdom of the legislative policy

of taxing one class and not another is not a matter for the courts.' Commonwealth v. Life Assurance Co. of Pa., 419 Pa. 370, 377 n.11, 214 A. 2d 209, 215 n.11 (1965). As stated in Commonwealth v. Life Assurance Co. of Pa., Id. at 376-377, 214 A. 2d at 214: 'By necessity a wide discretion must be conceded to the Legislature in the classification of various businesses or occupations for purposes of taxation. . . .' " As further stated in *Commonwealth v. Life Assurance Co. of Pa.,* 419 Pa. 370, 376, 379, 214 A. 2d 209, 214, 215 (1965):

"The only constitutional limitation placed upon the power of the Legislature to distinguish between various entities for purposes of taxation is that their basis for doing so be reasonable. . . .

. . . .

"And where such distinction rests upon differences recognized and acted upon by the business world, it is not within the province of the courts to intrude. . . . So long as the classification is neither capricious nor arbitrary, there is no denial of the equal protection of the law. . . ." The distinction here between parking lots and other businesses and between commercial and residential parking lots, as has been held in *Philadelphia v. Samuels, supra,* and *McGillick v. City of Pittsburgh, supra,* satisfy constitutional requirements.

Within the general ambit of equal protection and uniformity, the appellants make two other arguments, one based on what this tax might be named and the other on the asserted inaccuracy of a statement in the preamble of the ordinance concerning the characteristics of the appellants' enterprises. As to the first, appellant Meyers Brothers contends that because the city at some time in the course of the litigation called the tax a license tax, it is such and under settled principles may not exceed the cost of regulation. As clearly declared in *Philadelphia v. Samuels, supra,* the measure

in question is an excise tax imposed upon the transaction of parking a motor vehicle. It is a revenue measure by terms of the ordinance and by the Act of Assembly by which it was authorized. In *Philadelphia Tax Review Board v. Smith, Kline and French Laboratories,* 437 Pa. 197, 262 A. 2d 135 (1970), the Supreme Court held that a tax imposed by the City specifically denominated a "License Tax" was nevertheless a revenue measure and not preempted by a state license and regulatory measure.[2]

The appellants' argument that the preamble of the ordinance here somehow supports their view that the classification of their enterprises for the tax is unreasonable is difficult to follow because it stems from a misreading of the ordinance. The preamble in question states: "Nonresidential parking places, by reason of the frequency of their use at various hours of the day, their location, their relationship to traffic congestion and other characteristics, present problems requiring municipal services and affect public interest, differently from parking places accessory to the use and occupancy of residences. . . ." The appellants say that this seeks to justify the classification of parking lots on the basis that such lots cause congestion and therefore require municipal services, and that because such lots

---

[2] The appellants also contend that they are subjected to double taxation because the city levies a six-mill tax on gross receipts upon all businesses in the city, also pursuant to The Local Tax Enabling Act. There is no constitutional prohibition of double taxation, (*Puntureri v. Pittsburgh School District,* 359 Pa. 596, 60 A. 2d 42 (1948)), provided uniformity is satisfied. *Plumly v. Philadelphia School District,* 182 Pa. Superior Ct. 122, 126 A. 2d 768 (1956). Not only is the general business tax imposed on the *privilege* of engaging in business in the city and the tax here is on the *parking transaction,* a different subject; but uniformity is, as we have herein held, supplied by the imposition of the same taxes upon all commercial parking establishments.

in fact alleviate congestion and reduce municipal concern for traffic congestion, the asserted basis for classification disappears. But the quoted portion of the ordinance, as we read it, does not seek to justify the distinction between parking lots and other businesses but between nonresidential and residential lots. Nor does it suggest that parking lots cause congestion; rather, it says that their activities are related to congestion and require municipal services.

We have attempted here to treat all of appellants' arguments based upon alleged want of equal protection and lack of uniformity. We have carefully considered their thorough briefs and have concluded that the ordinance satisfies these constitutional requirements.

The appellants further vigorously contend that rate of tax here imposed is so high as to result in the taking of their property without due process of law. A tax, they say, which is confiscatory is unconstitutional. Despite the city's argument and the finding of the court below to the contrary, this tax is indeed imposed at an unreasonable rate. The *undisputed evidence* on this record is as follows:

1. There are about 24,300 parking spaces in the City of Pittsburgh. Of this number 6100 are served by a public parking authority, subjected to this tax, but exempt from other taxes including those on real estate. Of the balance of about 18,000 spaces, the plaintiffs here owed or operated about 17,000.

2. Based upon six months' operations and a sound statistical projection for the balance of the year 1970 with expenses computed at 1969 rates, that portion of the industry represented by appellants, would, during the year 1970, earn gross revenues of over $8,000,000, pay $1,600,000 on account of this tax and sustain a loss of $270,000. Of the fourteen appellant enterprises nine would sustain losses and of the others the one

showing the largest profit would earn an amount equal to only 2.9% of its gross revenues.[3]

3. The appellants are unable to pass the tax on to their customers, not only because customers cannot and will not pay higher rates but also because the appellants are in competition with a public authority which, exempt from other taxes, can charge less.

4. The rate of tax was increased from fifteen per centum effective in 1969 to twenty per centum, although in 1969 the appellants lost $26,000 on gross revenues of about $7,700,000 on which they paid a tax under this ordinance of more than $1,400,000.

The problem, however, is that there is no constitutional prohibition of taxation at unreasonable or even confiscatory rates. The appellants' argument upon this point rests primarily upon the following statement by Mr. Justice LINN in *Philadelphia v. Samuels,* 338 Pa. at 327, 12 A. 2d at 82: "Little need be said on the point that the ordinance is confiscatory. The state expressly authorized the city to levy taxes for general revenue purposes and the ordinance so provides. There is nothing in the record to show that the rate imposed by the ordinance is so high as to result in taking property without due process. The probability is that, in effect, the tax will be passed on to patrons, but if it is not, and if an occasional operator cannot afford to continue in business and pay the tax, it may be unfortunate but will not render the ordinance invalid." At most this statement supplies no more than an implication that an ordinance which makes it impossible for more than an occasional operator to remain in business might be in-

---

[3] Omitted from these figures are four operations. The record is clear that one of those omitted would have shown a sizable loss due to unusual factors. The other three were management operations for which the appellants received a fixed fee and the owners took losses.

valid. On the other hand, language used by the Supreme Court in *Philadelphia v. Eglin's Garages, Inc.,* 342 Pa. 142, 144, 19 A. 2d 845 (1941), one year later indicates second thoughts concerning the quoted portions of the *Samuels* case: "Proof of the averments of loss . . . would not establish confiscation even if relevant. . . . In my view, therefore, the averments of loss referred to are not sufficient to sustain the charge of confiscation *assumed to be relevant."* (Emphasis supplied.) It is apparent to us that our Supreme Court had in the interval considered the question in the light of very clear principle that a tax for revenue purposes is subject to no constitutional limitation upon its amount. Hence, writers and the courts have declared:

"The power to impose taxes is one so unlimited in force and so searching in extent, that the courts scarcely venture to declare that it is subject to any restrictions whatever, except such as rest in the discretion of the authority which exercises it. . . ." Cooley, *Constitutional Limitations,* Eighth Ed. (1927) Vol. II, C. XIV, page 986.

"[T]he power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power is found in the structure of the government itself. In imposing a tax, the legislature acts upon its constituents. This is, in general, a sufficient security against erroneous and oppressive taxation.

"The people of a state, therefore, give to their government a right of taxing themselves and their property; and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legisla-

tor, and on the influence of the constituents over their representative, to guard them against its abuse." Chief Justice JOHN MARSHALL in *McCulloch v. Maryland,* 4 Wheat. 316, 428, 17 S. Ct. 579, 607 (1819).

"Except in rare and special instances, the due process of law clause contained in the Fifth Amendment is not a limitation upon the taxing power conferred upon Congress by the Constitution. Brushaber v. Union Pac. R. R., 240 U.S. 1, 24. 36 S. Ct. 236, 60 L. Ed. 493. And no reason exists for applying a different rule against a state in the case of the Fourteenth Amendment. French v. Barber Asphalt Paving Co., 181 U.S. 324, 329, 21 S. Ct. 625, 45 L. Ed. 879; Heiner v. Donnan, 285 U.S. 312, 326, 52 S. Ct. 358, 76 L. Ed. 772. That clause is applicable to a taxing statute such as the one here assailed only if the act be so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property. Compare McCulloch v. Maryland, 4 Wheat. 316, 423, 4 L. Ed. 579; Child Labor Tax Case, 259 U.S. 20, 37, et seq., 42 S. Ct. 449, 66 L. Ed. 817, 21 A.L.R. 1432; McCray v. United States, 195 U.S. 27, 60, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; Brushaber v. Union Pac. R. R., supra, 240 U.S. 24, 25, 36 S. Ct. 236, 60 L. Ed. 493, L.R.A. 1917D, 414, Ann. Cas. 1917B, 713; Henderson Bridge Co. v. Henderson, 173 U.S. 592, 614, 615, 19 S. Ct. 553, 43 L. Ed. 823; Nichols v. Coolidge, 274 U.S. 531, 542, 47 S. Ct. 710, 71 L. Ed. 1184, 52 A.L.R. 1081. Collateral purposes or motives of a Legislature in levying a tax of a kind within the reach of its lawful power are matters beyond the scope of judicial inquiry. McCray v. United States, supra, 195 U.S. 56-59, 24 S. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561. Nor may a tax within the lawful power of a state be

judicially stricken down under the due process clause simply because its enforcement may or will result in restricting or even destroying particular occupations or businesses (Citizens' Sav. & Loan Association v. Topeka, 20 Wall. 655, 663, 664, 22 L. Ed. 455; McCray v. United States, supra, 195 U.S. 56-58, 24 S. Ct. 169, 49 L. Ed. 78, 1 Ann. Cas. 561, and authorities cited; Alaska Fish Co. v. Smith, 255 U.S. 44, 48, 49, 41 S. Ct. 219, 65 L. Ed. 489; Child Labor Tax Case, supra, 259 U.S. 38, 40-43, 42 S. Ct. 449, 66 L. Ed. 817, 21 A.L.R. 1432), unless, indeed, as already indicated, its necessary interpretation and effect be such as plainly to demonstrate that the form of taxation was adopted as a mere disguise, under which there was exercised, in reality, another and different power denied by the Federal Constitution to the state. The present case does not furnish such a demonstration." Justice SUTHERLAND in *A. Magnano Co. v. Hamilton,* 292 U.S. 40, 44, 45, 54 S. Ct. 599, 601, 602 (1934). Instructive early Pennsylvania cases to the same effect are *Kirby v. Shaw,* 19 Pa. 258 (1852); *Sharpless v. Mayor of Philadelphia,* 21 Pa. 147 (1853); *Washington Avenue,* 69 Pa. 352 (1871).

We have examined the cases cited by the appellants as authority for the power of a court to strike down taxing ordinances found to be excessive[4] and find them inappropriate to this case. In each the exorbitant exaction was in the form of a true municipal charge for conducting an otherwise lawful business and in each there were overtones of either subservience to a private purpose or lack of uniformity or attempt to regulate. No such conditions exist with regard to this general

---

[4] *Hoffman v. Borough of Neptune City,* 137 N.J. L. 485, 60 A. 2d 798 (1948); *Fetter v. City of Richmond,* 346 Mo. 431, 142 S.W. 2d 6 (194 ); *Martin v. Nocero Ice Cream Co.,* 269 Ky. 151, 106 S.W. 2d 64 (1937); *Peel v. Dummit,* 308 Ky. 399, 214 S.W. 2d 605 (1948).

revenue measure. In any event, there are no similar Pennsylvania cases.

Having concluded that there is no constitutional infirmity suffered by the ordinance before us based upon the rate of taxation, it remains for us to consider whether The Local Tax Enabling Act contains a limitation upon the city's power to impose a tax in the unreasonable amount here levied. Section 5 of the Act, 53 P.S. §6905 provides that: "Any tax imposed under this act shall not be subject to any limitations under existing laws as to rate or amount or as to the necessity of securing court approval or as to budgetary requirements." However, Section 6, 53 P.S. §6906, authorizes taxpayers to appeal from the taxing ordinance or resolution within thirty days of its enactment and imposes upon the court the duty ". . . *to declare the ordinance* and the tax imposed thereby *to be valid unless it* concludes that the ordinance is unlawful or *finds that the tax imposed is* excessive or *unreasonable; but the court shall not interfere with the reasonable discretion of the legislative body* in selecting the subjects or *fixing the rates of tax. The court may declare invalid all or any portion* of the ordinance or of the *tax imposed* or *may reduce the rates of tax."* (Emphasis supplied.) We take these two sections together to mean that the legislative body is not, except as the Act itself provides limitations on the amounts of certain levies, limited as to the rate it may impose in the first instance; but that, if an appeal is filed pursuant to Section 6, the court may examine into the reasonableness of the tax and order a reduction if it finds that the legislative body has abused a reasonable discretion in fixing the rate. We must also conclude that while the Legislature intended that there should be an opportunity to obtain a judicial determination of the reasonableness of the rate, it intended to foreclose such examination unless made in

the timely fashion it prescribed. Thus, the Legislature wisely placed a check on the possible excesses of municipalities at the same time ensuring them of the revenue sought in the absence of an attack promptly made. No taxpayer appeal under Section 6 was here taken;[5] why, we are not told.

For the foregoing reasons we affirm the order of the court below.

OPINION BY JUDGE KRAMER, CONCURRING IN PART AND DISSENTING IN PART:

I concur with my brothers of the majority in their holding that the private parking operators (appellants) have not proven any improper classification or illegal subject matter for taxation in violation of the Pennsylvania or United States Constitutions.

I must register my dissent to the result of the majority opinion because I believe that the record supports an allegation of the Complaint, to wit, that this parking tax increase violates the Equal Protection Clause of the United States Constitution, as found in the Fourteenth Amendment, which, *inter alia,* reads: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

It is first necessary to point out that, under the decisional law, it was not necessary for these appellants to proceed under the statute to test the constitutionality of a tax measure as suggested by the majority. In the case of *Lynch v. Owen J. Roberts School District,* 430

---

[5] The appellants could certainly have mustered the twenty-five aggrieved taxpayers necessary for such an appeal. Further, in this connection, we believe that the reenactment of an ordinance required by Section 4 of The Local Tax Enabling Act to be advertised because of a change of rate is a "tax levied for the first time" from which a Section 6 appeal might be taken. *Compare Glassmoyer v. Owen J. Roberts School District,* 18 Ches. Co. Rep. 85 (1970).

Pa. 461, 465, 244 A. 2d 1, 3 (1968), the Pennsylvania Supreme Court stated: "While we agree with the general proposition that equity will not entertain an action where plaintiff has an adequate, statutory remedy at law, we also acknowledge the presence of an exception to that doctrine, existing where a taxing statute is made the subject of a *constitutional* challenge." (Emphasis included.) Later the Court stated: "Finally, we note that the equity court, having once obtained jurisdiction because of the presence of a constitutional challenge to a taxing statute, may also dispose, as did the lower court here, of nonconstitutional challenges as well." 430 Pa. at 466, 244 A. 2d at 3. *See also, Campbell, et al. v. Coatesville Area School District,* 440 Pa. 496, 270 A. 2d 385 (1970). Following the holding in the *Lynch* case, *supra,* I would also pass upon the reasonableness of the tax increase. On its face, the Taxing Ordinance in question levies a 20 percent tax upon all parking transactions of operators of nonresidential parking places, including governmental parking authorities. However, we should not analyze the Ordinance and the Record while wearing blinders to all of the facts.

This record conclusively proves that of the twelve private parking operator appellants, nine will sustain losses, and none of the others will earn more than about three percent per year.

One of the appellants' exhibits (Plaintiffs' Exhibit No. 1) sets forth in great detail their financial operating facts of life. It is based upon what were, at the time of trial, the latest actual operating statistics for the first six months of 1970 and projecting the same revenues and expenses for the balance of the year. A statistical summary of those figures, giving effect to the increased parking tax (at the 20 percent rate), proves better than a verbal description, what has happened to the parking business in the City of Pittsburgh.

| Operator | Number of Locations | Total Gross Parking Revenue 1970 | Total Income (Loss) | Income as of % of Revenue |
|---|---|---|---|---|
| Alco Parking Corp. | 10 | $1,446,446 | (5,981) | — |
| William Penn Parking Lots | 9 | 661,571 | (3,703) | — |
| Parking Service Corp. | 3 | 1,965,264 | (118,887) | — |
| Arena Parking, Inc. | 2 | 404,048 | 729 | 0.2% |
| Fourth Avenue Parking, Inc. | 2 | 550,964 | 16,126 | 2.9% |
| William Penn Parking Garage, Inc. | 1 | 130,613 | (5,384) | — |
| Campus Parking Inc. | 1 | 146,136 | (19,048) | — |
| Grant Parking, Inc. | 1 | 320,178 | (62,429) | — |
| Oliver Plaza Garage | 1 | 282,923 | 650 | 0.2% |
| Liberty Avenue Lots | 1 | 175,403 | 536 | 0.3% |
| Stanwix Autopark | 3 | 638,895 | (13,604) | — |
| Liberty Parking | 7 | 146,380 | (41,906) | — |
| Meyers Parking System | 1 | 1,015,188 | 17,377 | 1.7% |
| K-Seven Parking Co., includes St. Francis Hospital Lot | 4 | 285,549 | (34,175) | — |
| Total | 46 | $8,169,558 | (269,699) | — |

It is possible that other operating expenses of the private parking operators also may have increased during the test period in question; but the record in this case does not support any argument that the total of all such possible other increases would have had the impact of the increased tax here in question.

The record shows that the appellants represent about 71 percent of the total commercial parking spaces in the City, and that the public parking authorities represent about 25 percent of such parking spaces. The public parking authority charges lower rates and suffered no losses;[1] further it pays no real estate taxes on

---

[1] We can take judicial notice of the published financial reports of the Public Parking Authority of Pittsburgh, which show that it consistently has earned handsome annual profits, including the test year, 1970.

realty used for parking, no business receipts taxes and no gross receipts taxes. Appellants enjoy no tax exemption.

The court below found that none of these appellants proved that they could not raise their parking rates so as to recover the increased tax levied by the City. The record indicates to me, however, that at least one of the appellants twice raised its parking rates with disastrous results, thus supporting appellants' argument that they would lose more money by raising parking rates. The majority correctly recognized that the 20 percent tax rate is an unreasonable one based upon the facts submitted by the appellant parking operators. Under the holding of *Lynch, supra,* this Court could have voided this tax increase or remanded the case.

When most of the private taxpayer classification is caused to suffer financial losses (based upon an annual income statement) in the operation of their businesses resulting from an unreasonable tax increase, while at the same time the competitive governmental parking authority is permitted to use lower parking rates and realize profits because of its preferential treatment, via tax exemptions (on a total tax basis), I would hold that such private taxpayers have suffered a violation of their constitutional rights.

Under our free enterprise capitalistic system, the government was never intended to enter into competitive private businesses, except as may be justified under its police powers. When this Commonwealth instituted the authority approach to public services, it was never intended as an intentional and direct method of governmental competition with its citizens. Rather, it was intended as a means to circumvent the constitutional limitations on governmental indebtedness, where certain public services were in need of capital investment not otherwise available or provided by private citizens or

businesses. Except for matters purely within a governmental function, government should not provide capital and labor to compete with its citizens. To some, who believe in some form of government other than that which we enjoy, the government should take over all businesses affecting the public interest. To them, in Pennsylvania, it would be appropriate for government to take over the steel mills and use government employees to run them, much like that which was done with the retail sale of liquor. Such a philosophical approach does violence to my understanding of our present system of government. Therefore, I believe great caution should be taken to make certain that a competing government does not force the private businesses of our citizens out of existence by an arbitrary use of otherwise unrestricted taxing powers.

Private parking operations were a recognized private business long before governmental *parking* authorities came into existence.[2] Though the Legislature declared that these authorities were necessary for the public safety and welfare; and even if it could be proven that private enterprise had not the wherewithal to supply sufficient parking facilities for the public, the fact remains that once government entered this private business field it was given an unfair advantage over the private sector through tax exemptions. (*See* 53 P.S. 355.)

The record in this case indicates that the governmental parking authority competitor does not pay real estate taxes or gross receipts taxes to the City, while the appellants do pay such taxes. Authorities were not instituted for the purpose of making profits and therefore should show none. Parking authorities' parking rates are lower because of the legislative directions and

---

[2] See the Parking Authority Law, Act of June 5, 1947, P. L. 458, as amended, 53 P.S. 341, et seq.

advantages they receive. Apparently the private sector of the parking business survived, even with these differentials, for many years. But now, as the record shows, the City has raised the parking tax, here in question, to a point where most of the private sector is losing money in its overall operation. It doesn't take a graduate economist to understand that losing business ventures eventually go out of existence. This point is especially important when one realizes that after the authorities' bonds and other debts are paid in full the parking authority will go out of existence, and all of its assets and business will be owned and operated by the City. (See 53 P.S. 354)

This is not a case where one or two marginal private operators are being forced out. *See Philadelphia v. Samuels,* 338 Pa. 321, 12 A. 2d 79 (1940). This is a case where most of the private operators are being forced out of business. It doesn't take a person with psychic powers to see that government, under such facts, will eventually take over all of the parking facilities in the City. Another five or ten percent increase in this tax may complete the job.

I find this case to be one of first impression in our courts. The debilitating effect upon a citizen's property rights due to a combination of an unreasonable high tax rate and direct governmental business competition, should be recognized. The new wrinkle in the aged face of the principle that the Legislature possesses unrestricted taxing powers, is the advent of government competing with the private business of its citizens; and this gives the picture a new appearance heretofore unviewed by the courts.

Mr. Justice HOLMES, dissenting in the case of *Panhandle Oil Co. v. Mississippi, ex rel. Knox,* 277 U.S. 218, 223, 72 L. Ed. 857, 859 (1928), and in speaking generally of the taxing powers of the Legislature, said:

"In those days [referring to the time of Mr. Chief Justice MARSHALL and McCulloch v. Maryland, 4 Wheat. 316, 17 S. Ct. 579 (1819)] it was recognized as it is today that most of the distinctions of the law are distinctions of degree. If the States had any power it was assumed that they had all power, and that the necessary alternative was to deny it altogether. But this Court which so often has defeated the attempt to tax in certain ways can defeat an attempt to discriminate or otherwise to go too far without wholly abolishing the power to tax. The power to tax is not the power to destroy while this Court sits. The power to fix rates is the power to destroy if unlimited, but this Court while it endeavors to prevent confiscation does not prevent the fixing of rates." Mr. Justice HOLMES expresses my sentiments.

I would hold that where government creates an unreasonable tax rate (as found by the majority) which forces private citizens to operate at a deficit, while simultaneously permitting competing governmental operations to continue operating at lower parking rates and with profits from such operation, owing to other tax exemptions, such a tax rate, as a part of the total city tax load imposed on its competition, is a denial of the Equal Protection Clause of the United States Constitution and in addition is illegally confiscatory.

In the Seventeenth Century, J. B. Colbert, Controller-General of Finance to Louis IV, offered a maxim widely accepted for its intrinsic merit: "The art of taxation consists in so plucking the goose as to obtain the largest amount of feathers with the least amount of hissing." Evans; Dictionary of Quotations; 680; 1st Ed. (1968). In this case, even the life's blood of the proverbial goose is being drained.

The theory of government's power to tax beyond a reasonable limit, as stated by the majority, is axio-

matic. However, none of the cases cited goes so far as to make such a maxim absolute.

Once again I quote a Mr. Justice HOLMES dissent. In the case of *Hyde v. U. S.*, 225 U.S. 347, 391, 56 L. Ed. 1114, 1135 (1912), he said: "It is one of the misfortunes of the law that ideals become encysted in phrases and thereafter for a long time cease to provoke further analysis."

The competition of a governmental parking authority adds a new dimension to the tax issues raised and from my point of view requires further analysis. If the government desires both an unreasonable high tax and an unfair competitive business position, it should be forced to prove the need for such a tax.

I would reverse and remand to permit the City to prove its need for this unreasonable tax increase.

Judge MENCER joints in this Opinion.

Judge CRUMLISH, JR., joins in this Opinion.

---

OPINION BY JUDGE ROGERS FOLLOWING REARGUMENT, October 10, 1972:

This court affirmed the order of the lower court in this matter[1] but thereafter allowed reargument. The case has been reargued and additional briefs have been filed and carefully considered.

A principal factual issue below was as to the effect of the tax on appellants' parking lot operations. The expression of the opinion writer's belief that the 20 percent gross receipts tax was unreasonable is now equated by the appellants to a finding by this court that the tax was confiscatory. No such characterization of the taxing measure was made or intended to be made. Indeed the Court found that the ordinance was an exertion of the taxing power and did not constitute the

---

[1] 291 A. 2d 556, 563 (1972).

exertion of a different and forbidden power, as, for example, the confiscation of property. Further, neither the Constitution of the United States nor of this Commonwealth imposes a standard of reasonableness in the *rate* of taxation. The cases cited in our opinion recognize this principle and the unspoken but real danger to our system of government should the courts assume power to review revenue measures by such a standard. It is true that a public parking Authority operates in competition with appellants' lots. However, the tax before us is imposed on transactions of the Authority as well as those of the appellants and we do not perceive a purpose here to favor the Authority by destroying the appellants' businesses. Of course, the Legislature may afford court review of reasonableness and, as we noted, did so in Act 511 by procedures not invoked by the appellants.

The City advises us at reargument that our statement that there are 24,300 parking spaces in the City of Pittsburgh is erroneous and that that figure represents the number of parking spaces only in the "downtown" area. The lower court found that the number in question represented all spaces in the City. The appellants made the same assertion in their brief and this was uncontested by the City. A close examination of the record demonstrates that the court below, the appellants and we were incorrect and that the figure mentioned indeed represents the number of parking spaces in the "downtown" area only. While a higher number of spaces in the City, by reducing the percentage of appellants' lots to the total tends to bolster the City's assertion that the levy was in fact not unreasonable, it obviously had no effect on our *decision* upholding the ordinance.

We adhere to our decision affirming the order of the court below.

DISSENTING OPINION BY JUDGE KRAMER FOLLOWING REARGUMENT.

After reargument and reviewing the majority opinions, I must again register my dissent by reasserting the points made in my prior dissenting opinion, filed herein, which is made a part hereof by reference thereto. *See* 291 A. 2d 556, 563 (1972).

Based upon the record before us, I would still hold the unreasonable high twenty per cent (20%) parking tax to be confiscatory. I would still remand the case to the court below for further hearings on reasonableness.

The majority, in its second opinion, quite correctly points out the discrepancy in the number of parking spaces in the City of Pittsburgh; and, as was noted at the reargument, the number of Authority parking spaces in the neighborhood areas outside of the downtown business district, together with the number of parking spaces contained in parking lots directly owned and controlled by the City, and operated with City employees, should also be noted as discrepancies or missing statistics in the record.

I would reverse and remand.

Judges CRUMLISH, JR. and MENCER join in this Dissenting Opinion.