JOURNAL ENTRY AND OPINION
{¶ 1} This case is an appeal from an order of Judge David T. Matia ruling that Brook Park Codified Ordinance Chapter ("BP.C.O.Ch.") 709 was a valid, constitutional excise tax levied on the gross receipts of appellants I-X Center Corporation ("I-X Corp.") and its parent, Park Corporation ("Park"), from parking fees at the International Exposition Center ("I-X Center"). They claim the tax is arbitrary and discriminatory and without rational basis. We reverse.
{¶ 2} Park is a Nevada corporation licensed to do business in Ohio, and I-X Corp. is an Ohio corporation and a wholly-owned subsidiary of Park. I-X Corp. leases the I-X Center from the City of Cleveland as a convention center, for home shows, amusement parks, etc. and is the only convention center in the City of Brook Park.
{¶ 3} On December 15, 1998, Brook Park passed Ordinance 8511-1998, creating the current version of BP.C.O.Ch. 709, which imposed an "exhibition center parking tax" and made the I-X Center the only entity liable for taxes thereunder. In the recitals preceding the text of the ordinance itself, the purpose of the legislation was stated:
 {¶ 4} WHEREAS, Council desires to enhance the Community Economic Development for the residents of the City of Brook Park; and,
 {¶ 5} WHEREAS, to accomplish the needed revenues for enhancement of the Community Development Fund, there is a need to levy an Exhibition Center Parking Tax, * * *
{¶ 6} The funds themselves, at Section 2, are to be used for the following purposes:
{¶ 7} A. For the promotion of the [I-X Center]
{¶ 8} B. Land Purchases
{¶ 9} C. Road — Sewers
{¶ 10} D. Playground Improvements
 {¶ 11} E. Any other economic developments designated by Council by Ordinance.
{¶ 12} The ordinance imposes a tax of eight percent on gross revenues generated by parking fees at all I-X Center lots, and is to be paid monthly and submitted with an itemized accounting on a form approved by the City.[1] It also requires the I-X Center, as an operator of an exhibition center charging patrons a fee to park in its lots, to notify Brook Park at least forty-five days before it sells or transfers ownership of any I-X Center parking operation, and to disclose the identity of the buyer and provide other information.[2] Any potential buyer of an exhibition center parking business is required to give Brook Park notice of its intent at least forty-five days before transfer takes place.[3]
{¶ 13} Chapter 709 took effect on January 1, 1999, and I-X Center timely remitted its monthly tax along with notice that it was paying under protest. In 1999, the tax totaled $186,795.78.
{¶ 14} Brook Park simultaneously enacted BP.C.O.Ch. 708, which imposed a tax on operators of businesses engaged in providing airport parking or car rental services at a rate of $100 per year on each available parking space. While the stated purpose of this legislation was identical to that of BP C.O.Ch. 708, the revenues generated by this tax measure were not for the promotion of the I-X Center and expressly did not apply to the I-X Center "* * * as any fees relating to parking at the I-X Center are covered by * * * BP.C.O. 709." In its operation, this ordinance amounts to roughly a three-percent tax of gross parking revenues on those businesses.
{¶ 15} Park and the I-X Center filed a declaratory judgment action against Brook Park and its Tax Commissioner, Shirley Gammella, and alleged that the tax violated the equal protection clauses of the United States and Ohio Constitutions, was an abuse of the city's municipal powers, imposed a non-uniform tax on income in violation of R.C. 718.01, and constituted an uncompensated taking of private property. It sought to have the tax declared void and unenforceable, the notice-upon-sale provisions contained in the ordinance found to be impermissible, and a refund of all BP.C.O.Ch. 709 taxes it paid, under protest.
{¶ 16} The parties agreed to submit the case on briefs and a stipulated statement of facts. The judge found that the tax was a valid and constitutional excise tax on persons exercising the privilege of parking for a fee at the I-X Center.
{¶ 17} The three assignments of error will be discussed in reverse order.
 {¶ 18} III. THE TRIAL COURT ERRED BY HOLDING THAT CHAPTER 709 IMPOSES AN EXCISE TAX ON PERSONS PARKING FOR THE PRIVILEGE OF OCCUPYING A PARKING SPACE AT AN EXHIBITION CENTER RATHER THAN AN UNCONSTITUTIONAL TAX ON THE INCOME OF EXHIBITION CENTER OPERATORS.
{¶ 19} "An `excise tax' is one imposed on the performance of an act, the engaging in an occupation, or the enjoyment of a privilege; the term, it has been said, is sufficiently broad in meaning to include every form of taxation not a burden laid directly on persons or property. In slightly different language it is said that an excise tax is a tax assessed for some privilege or immunity granted to some artificial or natural person, based upon the grant of such privilege or immunity. * * *"[4] An income tax is simply that, a tax on, as defined in Webster's Dictionary, "Money or its equivalent received during a time period in exchange for labor or services, from the sale of goods or property, or a profit from financial investments."[5]
{¶ 20} Ohio municipalities have a constitutional right to tax, conferred by the Home Rule amendments to the Ohio Constitution,[6] but such right can be legislatively abridged by the General Assembly.[7]
Under R.C. 718.01, a municipal corporation may tax income only if the rate of the tax is uniform, and any rate above one percent is approved by the majority of a popular vote at a general, primary or special election. In contrast, however, is R.C. 715.09:
 {¶ 21} A municipal corporation that imposes an excise or any other tax on the parking, housing, or storage of a motor vehicle in a lot, building, or other facility used for parking, housing, or otherwise storing motor vehicles shall not impose the tax at a rate greater than eight per cent of the fee or consideration charged for the parking, housing, or storage of the motor vehicle.
{¶ 22} BP.C.O.Ch. 709 describes the tax as a percentage of the gross receipts of the I-X Center parking facilities. It has been unambiguously held that an excise tax measured as a percentage of gross receipts, such as a statewide tax levied on public utilities, is not a tax on income, per se, but is an excise tax by virtue of such a designation in the statute creating the authority for the tax.[8] R.C.715.09, supra, in much the same way, defines a tax levied on the transaction of parking or housing an automobile as an excise tax and, by implication, not an income tax. Moreover, it endorses the measurement of the tax amount as a percentage of the fee charged for the service, in placing the ceiling for such an excise tax at eight percent of the charge.[9] The broad and conclusory characterization of the tax at issue as an income tax is unwarranted.
{¶ 23} The judge agreed with Brook Park's contention that the tax imposed represented an excise tax, levied against individuals making use of I-X Center parking spaces and relied on Northfield v. Northeast OhioHarness, supra. Factual distinctions, however, make Northfield
distinguishable, and hence, not dispositive. BP.C.O.Ch. 709 places a tax burden upon every "* * * Exhibition Center in the City of Brook Park that charges a parking fee * * *."[10] It does not tax any patron for parking in an I-X Center lot, although in practical terms the tax may be absorbed by patrons through an increased fee; and, additionally, imposes personal liability upon exhibition center operators for the tax.[11]
Therefore, unlike Northfield,[12] the ordinance at issue taxes the I-X Center, the provider of the privilege, rather than the patron exercising the privilege of parking. As such, we find that Brook Park enacted an excise tax against the I-X Center, rooted in its privilege to carry on the business of charging its patrons to park in its lots, whether or not they actually attend I-X Center events.
{¶ 24} Hence, this assignment of error is well taken, in part.
 {¶ 25} I. THE TRIAL COURT ERRED BY FINDING THAT THE CLASSIFICATION SCHEME OF CHAPTER 709 OF THE BROOK PARK CODIFIED ORDINANCES DERIVES FROM A DIFFERENCE IN THE NUMBER OF VEHICLES AND PEOPLE ATTENDING THE I-X CENTER AND ASSOCIATED COSTS OF NECESSARY MUNICIPAL SERVICES FOR THE I-X CENTER.
 {¶ 26} II. THE TRIAL COURT ERRED BY HOLDING THAT CHAPTER 709 SATISFIES THE EQUAL PROTECTION CLAUSES OF THE UNITED STATES AND OHIO CONSTITUTIONS.
{¶ 27} All Ohioans are afforded the equal protection of law under both the Fourteenth Amendment to the United States Constitution and Article I, Section 2 of the Ohio Constitution. Ohio courts presume the constitutionality of legislative enactments,[13] and that the presumption of constitutionality may only be overcome when a complaining party demonstrates that the legislation is incompatible with Constitutional principles beyond a reasonable doubt.[14]
{¶ 28} A law does not offend equal protection principles if it was enacted in the furtherance of a legitimate legislative interest despite the resulting unequal treatment. "As a general rule, `legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality.'[15] * * * In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification * * *."[16] The reason for a classification of groups under a law need not be articulated by the legislative body, but may be inferred by the court. "To be sure, the Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification. * * * Nevertheless, * * * review does require that a purpose may conceivably or `may reasonably have been the purpose and policy' of the relevant governmental decisionmaker."[17] The Equal Protection Clause does not forbid classifications, it simply keeps governmental decisionmakers from treating differently persons who are, in all relevant respects, alike.[18]
{¶ 29} The avowed purposes of both BP.C.O.Chs. 708 and 709 are to raise revenue for Brook Park's Community or Economic Development Fund,[19] for essentially the same purposes: Land/Building purchases, roads and sewers, playground improvements, or any other economic development projects designated by City Council by ordinance;[20]
although it is noteworthy that Ch. 709 was also enacted to provide funds for the promotion of the I-X Center.[21]
{¶ 30} Taxes assessed for purely revenue-raising purposes are permissible,[22] and the United States Supreme Court has further found that placing an excise tax on commercial parking revenues, such as R.C.715.09 permits, is a valid exercise of taxing power, even if the imposition of the tax makes operating a business engaged in that activity unprofitable.[23] It is clear that Brook Park, in creating a classification of taxpayers as those who engage in the business of charging a fee for the storage or parking of automobiles, has constitutionally exercised its power to levy an excise tax on such a profession.
{¶ 31} The judge found that, within the two classifications of taxpayers created by Brook Park, the disparity between excise charged — eight percent versus what amounts to about three percent for transient airport parking businesses — was justified. He based it on "* * * a legitimate difference in the number of vehicles and people attending the exhibition center and the associated cost of necessary municipal services for the I-X Center, such as road construction and repair, traffic control, sanitation and police and fire protection."[24]
Because both BP.C.O.Chs. 708 and 709 tax the same activity, temporarily parking vehicles for non-residential purposes, we fail to see how the number of parking spaces (approximately 7,000 for all I-X Center lots against 5,750 for Chapter 709 businesses) is itself significantly disparate to justify a heightened tax rate on I-X Center parking revenues. Nor is it apparent how this activity, engaged in by both groups within the classification, differently burdens municipal services such as sewers, off-site roads or police or fire services, or necessitates the promotion of the I-X Center.
{¶ 32} Motor vehicles, whether entering or exiting either the I-X Center or an airport parking facility, cause the same wear and tear on roads, present the same risks for potential accidents or other activities necessitating police/fire department interaction, and have no impact whatsoever on the city sewers. We agree with Brook Park, that the I-X Center as a whole and airport parking businesses merit different classifications and, "* * * to suggest that the operation of an exhibition center is similar to an airport parking operation is insulting to the Court."[25] We cannot see, however, that a parking lot at the I-X Center is different from one utilized by an airport-parking business, whatever the disposition of the proceeds of the tax.
{¶ 33} We find Associations, Conventions, Trade Shows, Inc. v.Ohio Expositions Comm.[26] ("Ohio Expositions"), persuasive because one class of vendors providing services at the Ohio Expositions Center in Columbus, the decorators, were taxed while other vendors were not. The Tenth District Appellate Court held the tax to be violative of equal protection rights and arbitrary, because the taxing authority presented no evidence or rationale distinguishing the additional burden decorators placed upon the exhibition center, as compared to other vendors. The facts and disposition of Ohio Expositions, involving the class of "vendors," appears to be factually on all fours with our disposition of this case, involving the class we define as "providers of fee-paid non-residential parking."
{¶ 34} We find beyond a reasonable doubt that no rational basis appears to exist for the distinction between an I-X Center parking tax and an airport parking/storage tax and that is a violation of equal protection constitutional standards.
{¶ 35} There has been no apparent increase in activity over the recent years at the I-X Center and no one chooses to characterize the tax placed on either the I-X Center or airport parking/storage facilities as an impact fee. It seems, however, that the number of persons using the I-X Center provided Brook Park and the judge with justification for a heightened tax burden on I-X Center parking because of the need for increased municipal services in and around it. In that case, the tax imposed on the I-X Center parking would have to be evaluated as an impact fee.
{¶ 36} When dealing with impact fees, the Ohio Supreme Court has held that, where the whole of a community is to share in improvements financed by a tax levied upon only part of a municipal population, the tax is impermissible as violative of equal protection principles where the overall funding scheme does not place a definite, concurrent burden upon existing residents.
{¶ 37} In Building Industry Assn. of Cleveland and SuburbanCounties v. Westlake,[27] the city imposed impact fees on new construction to finance the expected burdens such expansion would place on the recreation and park systems. Because only the owners of new construction had to finance the recreational fund used for the upkeep of common facilities and services to be used by the entire population of the city, this court, relying on Towne Properties v. Fairfield,[28] held that the imposition of the additional tax on new residents, without some firm matching commitment from existing residents, placed an impermissibly unequal burden on owners of new construction.
{¶ 38} By comparison, in Building Assn. of Dayton Miami Valleyv. Beavercreek,[29] the city established an impact fee/tax on new construction with revenues specifically earmarked for new transportation infrastructure in the impact area. The Ohio Supreme Court held that the presence or absence of a matching fund provision was not constitutionally determinative, merely a factor.
 {¶ 39} The appropriate test is one that examines whether the fee is in proportion to the developer's share of the city's costs to construct and maintain roadways that will be used by the general public.[30]
{¶ 40} Unlike Beavercreek, Brook Park made no economic analysis of the impact the size of, or activity at, the I-X Center had upon municipal services or that it required additional services, so as to justify an increased tax burden. It even charged the I-X Center over $88,000 in 1999 for on-site police, emergency medical services and fire protection. Should services or public facilities need to be expanded to accommodate activity around the I-X Center, the services and improvements would indisputably be available to Brook Park residents generally. The conclusory assertion that the I-X Center has an impact upon its immediately surrounding areas cannot provide a justification to single it out and arbitrarily impose upon it a tax that does not reflect its impact upon its surroundings or municipal finances. Brook Park, to "enhance the Community Economic Development for the residents," levied a tax on the I-X Center parking enterprise to generate revenue for the Community Development Fund. The only express, but non-mandatory, benefit from its contributions to the Fund is the "promotion" of the I-X Center, with the general population receiving the lion's share. Is taxing I-X Center parking fees an appropriate method to fund economic development in Brook Park and is the I-X Center paying a proportionate share for the benefit it receives?[31].
{¶ 41} Equal protection safeguards prohibit one constituency within a city to alone finance public improvements inuring to the benefits of all residents. There is no explicit requirement in BP.C.O.Ch. 709 that Brook Park contribute equivalent or any tax dollars to the Community Development Fund for resulting land purchases, or the improvement of its parks, roads or sewers which will be enjoyed by all its residents. We find that BP.C.O.Ch. 709, evaluated as an impact fee, violates equal protection constitutional standards and is invalid in toto. Assignments of error one and two have merit.
Judgment reversed, judgment entered for Park Corporation and I-X Center Corporation, and case remanded.
It is, therefore, ordered that appellants recover of appellees their costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA ANN BLACKMON, P.J., CONCURS; TERRENCE O'DONNELL, J., CONCURSIN JUDGMENT ONLY.
[1] Cod. Ord. 709.02.
[2] Cod. Ord. 709.07.
[3] Id.
[4] Northfield v. Northeast Ohio Harness (1983), 13 Ohio App.3d 218,219; 468 N.E.2d 911; Chope v. Collins (1976), 48 Ohio St.2d 297.
[5] Webster's II; New Riverside University Dictionary, Riverside
Pub. Co., 1988.
[6] Ohio Const. Article XVIII, Section 3.
[7] Ohio Const. Article XVIII, Section 13.
[8] The State, ex rel. City of Cleveland v. Kosydar (1973),36 Ohio St.2d 183; 305 N.E.2d 803, dealing with a statutory excise tax on the gross receipts of public utilities authorized by R.C. 5727.38 and 5727.81.
[9] See R.C. 715.09.
[10] Cod. Ord. 709.02(A).
[11] Cod. Ord. 709.02(G).
[12] Also, compare a somewhat analogous ordinance from the City of Cleveland, C.C.O. Ch. 196, which imposes an eight-percent tax upon patrons of businesses engaged in the occupation of housing vehicles for a fee. In far more similarity to the excise tax imposed in Northfield, the tax is specifically imposed on all such patrons, and every business is responsible for collecting the tax from the patron and remitting it to the City of Cleveland. See C.C.O. 196.02.
[13] State ex rel. Jackman v. Court of Common Pleas (1967),9 Ohio St.2d 159.
[14] Doyle v. Ohio Bureau of Motor Vehicles (1990), 51 Ohio St.3d 46,47.
[15] McGowan v. Maryland (1961), 366 U.S. 420, 425-426,6 L.Ed.2d 393.
[16] Nordlinger v. Hahn (1992), 505 U.S. 1, 10-11; 112 S.Ct. 2326;120 L.Ed.2d 1.
[17] Id. at 15; 112 S.Ct. 2326; 120 L.Ed.2d 1. (Internal cites omitted.)
[18] Nordlinger v. Hahn (1992), 505 U.S. at 10, 112 S.Ct. 2326,120 L.Ed.2d 1, citing F.S. Royster Guano Co. v. Virginia (1920),253 U.S. 412, 415, 64 L.Ed. 989, 40 S.Ct. 560.
[19] Ch. 708 defines the receiving City fund as the "Community Economic Development Fund," while Ch. 709 defines the receiving City fund as the "Community Development Fund." No differentiation of these funds is found in the Stipulated Statement of Facts submitted to the judge, and Brook Park Mayor Thomas J. Coyne, Jr., and Law Director David A. Lambros each testified in depositions in the record that the proceeds of both taxes are placed in the same fund.
[20] See Ord. 8509-1998, Section 5, (enacting Ch. 708) and Ord. 8511-1998, Section 2, (enacting Ch. 709).
[21] Ord. 8511-1998, Section 2(A).
[22] Pittsburgh v. Alco Parking Corp. (1974), 417 U.S. 369, 375,94 S.Ct. 2291, 41 L.Ed.2d 132.
[23] See Pittsburgh v. Alco Parking Corp., supra, dealing with an ordinance passed in Pittsburgh, Pennsylvania, imposing a twenty-percent tax on the gross receipts related to all transactions involving the storage of a vehicle at a non-residential parking place.
[24] Opinion and Judgment Entry, Vol. 2565, pgs. 0099-0105 at 0103.
[25] Defendant's Reply Brief at p. 8.
[26] (May 18, 1989), Franklin App. Nos. 88AP-784, 88AP-886.
[27] (1995), 103 Ohio App.3d 546, 660 N.E.2d 501.
[28] (1977), 50 Ohio St.2d 356, 364 N.E.2d 289.
[29] (2000), 89 Ohio St.3d 121, 729 N.E.2d 349.
[30] Beavercreek, supra, at 126, 729 N.E.2d 349.
[31] Beavercreek, supra, at 128, 729 N.E.2d 349.