CITY OF PITTSBURGH *v.* ALCO PARKING
CORP. ET AL.

No. 73–582.  Argued April 15, 1974—Decided June 10, 1974

WHITE, J., delivered the opinion for a unanimous Court. POWELL, J., filed a concurring opinion, *post*, p. 379.

*Ralph Lynch, Jr.,* argued the cause for petitioner. With him on the brief was *Grace S. Harris.*

*Leonard Boreman* argued the cause for respondents. With him on the brief were *Richard H. Martin, Leonard M. Marks,* and *Eric Bregman.**

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue in this case is the validity under the Federal Constitution of Ordinance No. 704, which was enacted by the Pittsburgh, Pennsylvania, City Council in December 1969, and which placed a 20% tax on the gross receipts obtained from all transactions involving the parking or storing of a motor vehicle at a nonresidential parking place in return for a consideration.[1] The ordinance

---

*\*James S. Hostetler* filed a brief for the Council for Private Enterprise et al. as *amici curiae.*

[1] The ordinance defined a nonresidential parking place as follows:

"(c) 'Non-Residential Parking Place' or 'Parking Place'—any place within the City, whether wholly or partially enclosed or open, at which motor vehicles are parked or stored for any period of time in return for a consideration not including:

"(i) any parking area or garage to the extent that it is provided or leased to the occupants of a residence on the same or other premises for use only in connection with, and as accessory to, the occupancy of such residence, and (ii) any parking area or garage operated exclusively by an owner or lessee of a hotel, an apartment hotel, tourist court or trailer park, to the extent that the parking area or garage is provided to guests or tenants of such hotel, tourist court or trailer park for no additional consideration.

"As used herein, the term 'residence' includes (i) any building designed and used for family living or sleeping purposes other than a hotel, apartment hotel, tourist court or trailer park, and (ii) any dwelling unit located in a hotel or apartment hotel.

"The terms 'hotel,' 'apartment hotel,' 'tourist court,' 'trailer

superseded a 1968 ordinance imposing an identical tax, but at the rate of 15%, which in turn followed a tax at the rate of 10% imposed by the city in 1962. Soon after its enactment, 12 operators of offstreet parking facilities located in the city sued to enjoin enforcement of the ordinance, alleging that it was invalid under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, as well as Art. VIII, § 1, of the Pennsylvania Constitution, which requires that taxes shall be uniform upon the same class of subjects. It appears from the findings and the opinions in the state courts that, at the time of suit, there were approximately 24,300 parking spaces in the downtown area of the city, approximately 17,000 of which the respondents operated. Another 1,000 were in the hands of private operators not party to the suit. The balance of approximately 6,100 was owned by the Parking Authority of the city of Pittsburgh, an agency created pursuant to the Parking Authority Law of June 5, 1947, Pa. Stat. Ann., Tit. 53, § 341 *et seq.* (1974). The trial court also found that there was then a deficiency of 4,100 spaces in the downtown area.

The Court of Common Pleas sustained the ordinance. Its judgment was affirmed by the Commonwealth Court by a four-to-three vote, 6 Pa. Commw. 433, 291 A. 2d 556 (1972), on rehearing, 6 Pa. Commw. 453, 295 A. 2d 349 (1972); but the Pennsylvania Supreme Court reversed, also four to three. 453 Pa. 245, 307 A. 2d 851 (1973). That court rejected challenges to the ordinance under the Pennsylvania Constitution and the Equal Protection Clause, but invalidated the ordinance as an uncompensated taking of property contrary to the Due Process Clause of the Fourteenth Amendment. Because the decision appeared to be in

park' and 'dwelling unit' are used herein as defined in the Zoning Ordinance, Ordinance No. 192, approved May 10, 1958, as amended."

conflict with the applicable decisions of this Court, we granted certiorari, 414 U. S. 1127 (1974), and we now reverse the judgment.[2]

In the opinion of the Supreme Court of Pennsylvania, two aspects of the Pittsburgh ordinance combined to deprive the respondents of due process of law. First, the court thought the tax was "unreasonably high" and was responsible for the inability of nine of 14 different private parking lot operators to conduct their business at a profit and of the remainder to show more than marginal earnings. 453 Pa., at 259–260, 307 A. 2d, at 859–860. Second, private operators of parking lots faced competition from the Parking Authority, a public agency enjoying tax exemption (although not necessarily from this tax)[3]

---

[2] It appears from the opinion of the Pennsylvania Supreme Court that Ordinance No. 704 was itself superseded while appeal was pending in the state courts. 453 Pa. 245, 266 n. 13, 307 A. 2d 851, 863 n. 13. The new ordinance, effective April 1, 1973, imposed a 20% tax on the consideration paid in nonresidential parking transactions, the tax to be collected from the patron by the operator. This case is not mooted by the new ordinance, however, for there remains the issue of substantial refunds of taxes collected under Ordinance No. 704.

[3] The ordinance on its face applies to all nonresidential parking transactions. The following, however, appears in n. 9 of the opinion of the Pennsylvania Supreme Court, 453 Pa., at 265, 307 A. 2d, at 862:

"As of this writing, the Allegheny County Court of Common Pleas has ruled that the Public Parking Authority is exempt from payment of the challenged gross receipts tax. *Public Parking Authority of Pittsburgh v. City of Pittsburgh,* No. 687, July Term, 1972. See *Allegheny County v. Moon Township,* 436 Pa. 54, 258 A. 2d 630 (1969). An appeal is presently pending before the Commonwealth Court.

"However, whether the Public Parking Authority is subject to the tax seems to make little real difference in the context of this present dispute. Even if the Authority had to pay the tax to the City it would mean only in reality an accounting transaction, transferring

and other advantages which enabled it to offer offstreet parking at lower rates than those charged by private operators. The average all-day rate for the public lots was $2 as compared with a $3 all-day rate for the private lots. *Ibid.* The court's conclusion was that "[w]here such an unfair competitive advantage accrues, generated by the use of public funds, to a local government at the expense of private property owners, without just compensation, a clear constitutional violation has occurred. . . ." "[T]he unreasonably burdensome 20 percent gross receipts tax, causing the majority of private parking lot operators to operate their businesses at a loss, in the special competitive circumstances of this case, constitutes an unconstitutional taking of private property without due process of law in violation of the Fourteenth Amendment of the United States Constitution." *Id.*, at 267, 269–270, 307 A. 2d, at 863, 864.

We cannot agree that these two considerations, either alone or together, are sufficient to invalidate the parking tax ordinance involved in this case. The claim that a particular tax is so unreasonably high and unduly burdensome as to deny due process is both familiar and recurring, but the Court has consistently refused either to undertake the task of passing on the "reasonableness" of a tax that otherwise is within the power of Congress or of state legislative authorities, or to hold that a tax is unconstitutional because it renders a business unprofitable.

In *Magnano Co.* v. *Hamilton,* 292 U. S. 40 (1934), the Court sustained against due process attack a state excise tax of 15¢ per pound on all butter substitutes sold in the

---

dollars from one pocket of an instrumentality of City government to another. Thus although appellants' argument would be strengthened by the common pleas court's decision, we need not presently rest our decision upon *Public Parking Authority of Pittsburgh* v. *City of Pittsburgh,* supra."

State. Conceding that the "tax is so excessive that it may or will result in destroying the intrastate business of appellant," *id.*, at 45, the Court held that "the due process of law clause contained in the Fifth Amendment is not a limitation upon the taxing power conferred upon Congress," that no different rule should be applied to the States and that a tax within the lawful power of a State should not "be judicially stricken down under the due process clause simply because its enforcement may or will result in restricting or even destroying particular occupations or businesses." *Id.*, at 44. The premise that a tax is invalid if so excessive as to bring about the destruction of a particular business, the Court said, had been "uniformly rejected as furnishing no juridical ground for striking down a taxing act." *Id.*, at 47. *Veazie Bank* v. *Fenno,* 8 Wall. 533, 548 (1869); *McCray* v. *United States,* 195 U. S. 27 (1904); and *Alaska Fish Co.* v. *Smith,* 255 U. S. 44 (1921), are to the same effect.

In *Alaska Fish,* a tax on the manufacture of certain fish products was sustained, the Court saying, *id.,* at 48–49: "Even if the tax should destroy a business it would not be made invalid or require compensation upon that ground alone. Those who enter upon a business take that risk. . . . We know of no objection to exacting a discouraging rate as the alternative to giving up a business, when the legislature has the full power of taxation." See also *International Harvester Co.* v. *Wisconsin Dept. of Taxation,* 322 U. S. 435, 444 (1944); *Child Labor Tax Case,* 259 U. S. 20, 30 (1922); *Brushaber* v. *Union Pacific R. Co.,* 240 U. S. 1, 24 (1916); *Flint* v. *Stone Tracy Co.,* 220 U. S. 107, 168–169 (1911).

Neither the parties nor the Pennsylvania Supreme Court purports to differ with the foregoing principles. But the state court concluded that this was one of those "rare and special instances" recognized in *Magnano* and

other cases where the Due Process Clause may be invoked because the taxing statute is "so arbitrary as to compel the conclusion that it does not involve an exertion of the taxing power, but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property." 292 U. S., at 44.[4]

There are several difficulties with this position. The ordinance on its face recites that its purpose is "[t]o provide for the general revenue by imposing a tax . . . ," and in sustaining the ordinance against an equal protection challenge, the state court itself recognized that commercial parking lots are a proper subject for special taxation and that the city had decided, "not without reason, that commercial parking operations should be singled out for special taxation *to raise revenue* because of traffic related problems engendered by these operations."    453 Pa., at 257, 307 A. 2d, at 858 (emphasis added).

It would have been difficult from any standpoint to have held that the ordinance was in no sense a revenue measure.    The 20% tax concededly raised substantial sums of money; and even if the revenue collected had been insubstantial, *Sonzinsky* v. *United States,* 300 U. S. 506, 513–514 (1937), or the revenue purpose only secondary, *Hampton & Co.* v. *United States,* 276 U. S. 394, 411–413 (1928), we would not necessarily treat this exaction as anything but a tax entitled to the presumption of the validity accorded other taxes imposed by a State.

---

[4] Cf. *Heiner* v. *Donnan,* 285 U. S. 312, 326 (1932); *Nichols* v. *Coolidge,* 274 U. S. 531, 542 (1927); *Child Labor Tax Case,* 259 U. S. 20, 37 *et seq.* (1922); *Brushaber* v. *Union Pacific R. Co.,* 240 U. S. 1, 24–25 (1916); *McCray* v. *United States,* 195 U. S. 27, 60 (1904); *Henderson Bridge Co.* v. *Henderson City,* 173 U. S. 592, 614–615 (1899); *M'Culloch* v. *Maryland,* 4 Wheat. 316, 423 (1819).

Rather than conclude that the 20% levy was not a tax at all, the Pennsylvania court accepted it as such and merely concluded that it was so unreasonably high and burdensome that, in the context of competition by the city, the ordinance had the "effect" of an uncompensated taking of property. 453 Pa., at 269, 307 A. 2d, at 864. The court did not hold a parking tax, as such, to be beyond the power of the city but it appeared to hold that a bona fide tax, if sufficiently burdensome, could be held invalid under the Fourteenth Amendment. This approach is contrary to the cases already cited, particularly to the oft-repeated principle that the judiciary should not infer a legislative attempt to exercise a forbidden power in the form of a seeming tax from the fact, alone, that the tax appears excessive or even so high as to threaten the existence of an occupation or business. *Magnano Co.* v. *Hamilton, supra,* at 47; *Child Labor Tax Case, supra,* at 40–41; *Veazie Bank* v. *Fenno, supra,* at 548.

Nor are we convinced that the ordinance loses its character as a tax and may be stricken down as too burdensome under the Due Process Clause if the taxing authority, directly or through an instrumentality enjoying various forms of tax exemption, competes with the taxpayer in a manner thought to be unfair by the judiciary. This approach would demand not only that the judiciary undertake to separate those taxes that are too burdensome from those that are not, but also would require judicial oversight of the terms and circumstances under which the government or its tax-exempt instrumentalities may undertake to compete with the private sector. The clear teaching of prior cases is that this is not a task that the Due Process Clause demands of or permits to the judiciary. We are not now inclined to chart a different course.

In *Veazie Bank, supra,* a 10% tax on state bank notes was sustained over the objection of the dissenters that the purpose was to foster national banks, instrumentalities of the National Government, in preference to private banks chartered by the States. More directly in point is *Puget Sound Co.* v. *Seattle,* 291 U. S. 619 (1934), where the city imposed a gross receipts tax on a power and light company and at the same time actively competed with that company in the business of furnishing power to consumers. The company's contention was that "constitutional limitations are transgressed . . . because the tax affects a business with which the taxing sovereign is actively competing." *Id.,* at 623. Calling on prior cases in support, the Court rejected the contention, holding that "the Fourteenth Amendment does not prevent a city from conducting a public water works in competition with private business or preclude taxation of the private business to help its rival to succeed." *Id.,* at 626. See also *Madera Water Works* v. *Madera,* 228 U. S. 454 (1913). The holding in *Puget Sound* remains good law and, together with the other authorities to which we have already referred, it is sufficient to require reversal of the decision of the Pennsylvania Supreme Court.

Even assuming that an uncompensated and hence forbidden "taking" could be inferred from an unreasonably high tax in the context of competition from the taxing authority, we could not conclude that the Due Process Clause was violated in the circumstances of this case. It was urged by the city that the private operators would not suffer because they could and would pass the tax on to their customers, who, as a class, should pay more for the services of the city that they directly or indirectly utilize in connection with the special problems incident to the twice daily movement of large numbers of cars on the streets of the city and in and out of parking garages.

The response of the Pennsylvania Supreme Court was that competition from the city prevented the private operators from raising their prices and recouping their losses by collecting the tax from their customers. On the record before us, this is not a convincing basis for concluding that the parking tax effected an unconstitutional taking of respondents' property. There are undisturbed findings in the record that there were 24,300 parking places in the downtown area, that there was an overall shortage of parking facilities, and that the public authority supplied only 6,100 parking spaces. Because these latter spaces were priced substantially under the private lots it could be anticipated that they would be preferred by those seeking parking in the downtown area. Insofar as this record reveals, for the 20% tax to have a destructive effect on private operators as compared with the situation immediately preceding its enactment, the damage would have to flow chiefly, not from those who preferred the cheaper public parking lots, but from those who could no longer afford an increased price for downtown parking at all. If this is the case, we simply have another instance where the government enacts a tax at a "discouraging rate as the alternative to giving up a business," a policy to which there is no constitutional objection. *Alaska Fish Co.* v. *Smith,* 255 U. S., at 49; *Magnano Co.* v. *Hamilton,* 292 U. S., at 46.

The parking tax ordinance recited that "[n]on-residential parking places for motor vehicles, by reason of the frequency rate of their use, the changing intensity of their use at various hours of the day, their location, their relationship to traffic congestion and other characteristics, present problems requiring municipal services and affect the public interest, differently from parking places accessory to the use and occupancy of residences." By enacting the tax, the city insisted that those providing and

utilizing nonresidential parking facilities should pay more taxes to compensate the city for the problems incident to offstreet parking. The city was constitutionally entitled to put the automobile parker to the choice of using other transportation or paying the increased tax.

The judgment of the Pennsylvania Supreme Court is

*Reversed.*

MR. JUSTICE POWELL, concurring.

The opinion of the Court fully explicates the issue presented here, and I am in accord with its resolution. I write briefly only to emphasize my understanding that today's decision does not foreclose the possibility that some combination of unreasonably burdensome taxation and direct competition by the taxing authority might amount to a taking of property without just compensation in violation of the Fifth and Fourteenth Amendments.

To some extent, private business is inevitably handicapped by direct governmental competition, but the opinion of the Court makes plain that the legitimate exercise of the taxing power is not to be restrained on this account. It is conceivable, however, that punitive taxation of a private industry and direct economic competition through a governmental entity enjoying special competitive advantages would effectively expropriate a private business for public profit. Such a combination of unreasonably burdensome taxation and public competition would be the functional equivalent of a governmental taking of private property for public use and would be subject to the constitutional requirement of just compensation. As the opinion of the Court clearly reveals, *ante,* at 377–378, no such circumstance has been shown to exist in the instant case.