Kelly M. EDWARDS and Demaris L. Edwards, t/d/b/a Lakeview on the Lake; Leo E. Gehres, Agnes C. Gehres and James A. Gehres, t/d/b/a Vernondale Motel; Maha Laxmi, Inc., t/d/b/a Travelodge; Marp, LLC, t/d/b/a Best Western; Paradise Lounge, Inc., t/d/b/a The Flamingo Motel; Riviera Motel, Inc., t/d/b/a Riviera; Scott's Court–Peach, Inc., t/d/b/a Courtyard by Marriott and Ambassador Banquet and Conference Center, Erie, Pennsylvania; Scott's Express–Peach, Inc., t/d/b/a Holiday Inn Express, Erie, Pennsylvania; Scott's I–90, Inc., t/d/b/a Days Inn, Erie, Pennsylvania; Scott's Inn–19, Inc., t/d/b/a Comfort Inn, Erie, Pennsylvania; Scott's Econo Inn, Inc., t/d/b/a Econo Lodge, Erie, Pennsylvania; Scott's Development Co., Inc., t/d/b/a Residence Inn by Marriott, Erie, Pennsylvania;

Scott's M6 Erie, Inc., t/d/b/a Motel 6, Erie, Pennsylvania; Thomas Phillips, Donna Phillips, Tammy Sanfilippo and Gaile Phillips–Smith, t/d/b/a The Golden Triangle Motel, Erie, Pennsylvania, Appellants

v.

COUNTY OF ERIE, Pennsylvania; City of Erie, Pennsylvania; Erie County Convention Center Authority.

Commonwealth Court of Pennsylvania.

Argued Feb. 6, 2007.

Decided Aug. 22, 2007.

Reargument En Banc Denied Oct. 16, 2007.

Michael A. Agresti, Erie, for appellants.

W. Patrick Delaney, Erie and Christopher A. Stump, Lancaster, for appellees.

BEFORE: LEADBETTER, President Judge, SMITH–RIBNER, Judge, (P.), and FLAHERTY, Senior Judge.

OPINION BY President Judge LEADBETTER.[1]

A group of hoteliers in Erie County appeal from the order of the Court of Common Pleas that sustained the constitutionality of the Third Class County Convention Center Authority Act (Alternative Provision) (hereinafter referred to as the Act), Act of October 18, 2000, P.L. 541, *as amended,* 16 P.S. §§ 2399.51–2399.73,[2]

---

1. This case was reassigned to the present author on May 29, 2007.

2. As an historical note, the General Assembly sought to promote the development of convention centers and, thereby, stimulate busi-

ness, industry, commerce and tourism by the enactment of the Act of December 27, 1994, P.L. 1375, formerly 16 P.S. §§ 13101–13124. Subsequently, by the Act of November 3, 1999, P.L. 461, *as amended,* 16 P.S.

added to The County Code, Act of August 9, 1955, P.L. 323, *as amended,* 16 P.S. §§ 101–3000.3903, and County Ordinance No. 45–2000, which imposes a hotel room tax as authorized by the Act. Common pleas rejected the hoteliers' contention that the use of a portion of the tax revenues for the development of a hotel connected to Erie's convention center imposes an excessive and disproportionate competitive burden on existing hotels. We affirm.

Pursuant to the power enabled by the Act, Erie County established a convention center authority and, by the enactment of Ordinance 45–2000, imposed a 5% room tax for the purpose, in part, of constructing and operating a "convention center facility."[3] In the course of planning for the development of a convention center, the Erie County Convention Center Authority (Authority) determined that the success of the center depended on the construction of a connected hotel and, toward this end, sought to arrange for a privately funded and operated "host hotel." After a local hotelier limited its plan to a hotel of 133 rooms rather than the minimum 200 rooms deemed necessary by the consulting firm hired by the Authority, the Authority undertook to construct the hotel as a publicly owned and funded facility. Thereafter, the Authority used a portion of the room tax revenues for planning and development of the "host hotel," which will be owned by the Authority, managed by White Lodging and marketed as a Sheraton. In November 2004, the state legislature amended the Act to specifically include a "hotel" within the definition

"convention center" or "convention center facility." *See* 16 P.S. § 2399.53. The amendment opened the door to spending a portion of the room tax revenue on the development, construction, financing, operation and management, debt service and promotion and marketing for the host hotel.

In June 2005, the hoteliers filed a declaratory judgment action to invalidate the Act insofar as it included hotels in the definition of "convention center" and, thereby, permitted use of taxes collected pursuant to the county ordinance for the development of a publicly owned and operated convention center "host hotel," which would harmfully compete with the existing taxed hotel rooms. After the dismissal of two counts on preliminary objections, the hoteliers proceeded to trial without a jury on four counts, asserting that the Act and the ordinance violated the due process clauses of the United States and Pennsylvania Constitutions (Counts I and II), the equal protection clause of the fourteenth amendment of the United States Constitution (Count III), and the equal protection clause in Article I, Section 26 of the Pennsylvania Constitution (Count IV). Before common pleas, the parties agreed that, generally, in order to meet their heavy burden of proving the tax unconstitutional, the hoteliers had to establish that their tax burden was palpably disproportionate to the benefits conveyed. Prior to trial, the hoteliers stipulated that they would not present evidence or argue that the collection of the room tax or its payment by

§§ 2399.1–2399.23, the General Assembly repealed and replaced the 1994 Act. The 1999 Act remains in effect. In October of 2000, the legislature enacted the "Alternative Provision," cited above, specifying therein that it applies only to third class counties where a convention center authority had not been established prior to January 1, 2000.

3. The Act authorizes that 80% of the room tax revenue be turned over to a municipal authority created for the purpose of developing and operating a convention center and that 20% be turned over to a local agency for the promotion of tourism. The hoteliers focus their challenge on the 80% of revenues devoted to the convention center.

hotel patrons constituted a burden.[4] Common pleas heard conflicting lay and expert testimony regarding the burden imposed upon the hoteliers as a result of competition from the "host hotel" and concluded that "the evidence presented by the Hotel Group was insufficient to prove that the use of the hotel tax to support the development and operation of the Sheraton host hotel will result in significant financial losses to the members of the group or to the local hotel industry in general." Based on its findings and following the denial of post-trial motions, common pleas entered judgment in favor of the defendants, Erie County, the City of Erie and the Authority. Thereafter, the hoteliers filed the present appeal.

On appeal, the hoteliers point out that in the series of cases since the mid–1980s, for the most part upholding the constitutionality of hotel room taxes for the development of local convention centers, this is the first one to involve a publicly funded, publicly owned host hotel. *See Bold Corp. v. County of Lancaster,* 569 Pa. 107, 801 A.2d 469 (2002); *Torbik v. Luzerne County,* 548 Pa. 230, 696 A.2d 1141 (1997); *Leventhal v. Philadelphia,* 518 Pa. 233, 542 A.2d 1328 (1988); *Allegheny County v. Monzo,* 509 Pa. 26, 500 A.2d 1096 (1985) (declaring county hotel room tax ordinance in violation of uniformity clause of state constitution and equal protection clause of federal constitution). They argue that this sets the present case apart from *Bold Corp.,* where our Supreme Court agreed with the trial court that a privately owned and operated convention center hotel is "merely capitalism at work." The hoteliers further contend that common pleas misperceived

the testimony, which they assert established that the Authority's hotel will take from the hoteliers two "room nights" for every one generated by the presence of the convention center and, thus, will essentially deprive them of the benefit of the new business generated by the convention center meeting facilities. In addition, the hoteliers argue that given its excessive size and scope, the Host Hotel must compete with the Hoteliers for non-convention business if it is to reach the ambitious occupancy projections needed to pay back the $40 million in bond debt. Hoteliers assert that the host hotel will prevail unfairly in the marketplace because subsidies from Erie County give the Authority the unique and unfair ability to undercut its competition by offering a premium product at below-market prices.

▉▉▉ The general legal principles governing a challenge to the constitutionality of a tax statute are well established. A tax enactment is presumed valid and the burden of proving otherwise rests on the challenger. The legislature has wide discretion in matters of taxation but nevertheless is constrained by the requirements of due process and equal protection or uniformity. In *Leventhal,* our Supreme Court explained:

> Both the federal equal protection clause, as applied to taxing statutes, and the state constitutional requirement of uniformity of taxation "upon the same class of subjects" (Pa. Const. Art VIII, § 1) mandate that classification in a taxing scheme have a rational basis. In either case, a classification for tax purposes is valid when it "is based upon some legiti-

---

**4.** The written stipulation, in pertinent part, provides: "Plaintiffs shall not present any evidence or argument at trial that the collection of the [hotel room tax] by county hotels or the payment of the [tax] by hotel patrons in and of itself constitutes a burden for purposes of establishing or proving any claim (including, but not limited to, any federal or state constitutional claim) and/or any benefit-burden analysis which may be pertinent to any such claim."

mate distinction between the classes that provides a non-arbitrary and 'reasonable and just' basis for the different treatment." Where there exists no legitimate distinction between the classes, and thus, the tax scheme imposes substantially unequal tax burdens upon persons otherwise similarly situated, the tax is unconstitutional. The controlling standard for determining whether a tax is violative of the Due Process Clause of the Fourteenth Amendment "... is whether the taxing power exerted by the state bears a fiscal relation to protection, opportunities and benefits given by the state. The simple question is whether the state has given *anything* for which it can ask a return." Where the benefit received and the burden imposed is palpably disproportionate, a tax is not only a taking without due process under the Fourteenth Amendment to the United States Constitution but also an arbitrary form of classification in violation of equal protection and state uniformity standards.

*Id.* at 239–40, 542 A.2d at 1331–32 (emphasis in original, citations omitted). *See also Bold Corp.,* 569 Pa. at 116, 801 A.2d at 474.

Our Supreme Court applied this test in *Monzo* to invalidate a hotel room tax imposed on all county hoteliers for the funding of a convention center in Pittsburgh. The Court noted that insofar as the hotel tax did not qualify as one for a general public use, such as taxes imposed for the benefit of public schools, the general rule, that a challenger cannot prevail on the ground that he receives no direct benefit, does not apply. 509 Pa. at 43, 500 A.2d at 1105. Rather, the Court looked to whether the challenger, a hotelier operating a hotel located near the Allegheny/Westmoreland County line, derived a benefit from the use of the tax revenues and concluded that "[t]he burden of the tax is imposed on hotels within the entire county

when, in reality, only those hotels and businesses located in or very near downtown (center city) Pittsburgh are benefited." *Id.* at 45, 500 A.2d at 1106. The present hoteliers do not base their challenge on any similar geographic inequity; rather, they assert that the host hotel will unfairly benefit from the use of tax revenues.

■ Applying the benefit/burden test, common pleas found that, while the host hotel will compete for business with the established hoteliers, the increased demand for rooms generated by the convention center as a going concern and by the expected downtown revitalization, as well as the general increase in tourism resulting from promotional marketing conducted with a portion of the tax revenues, will ultimately result in additional business for the benefit of the area hoteliers. On balance, common pleas discerned no palpably disproportionate burden to justify invalidating the tax. In so finding, common pleas resolved conflicts in the expert testimony in favor of the Authority, concluding that while none of the experts presented compelling testimony, those on behalf of the Authority based their opinions on a wider scope of experience and less speculation. Inasmuch as our review cannot revisit common pleas' assessment as to the weight and credibility of the testimony, we are bound by the findings if the record, considered in the light most favorable to the Authority as the prevailing party, supports them. *See Reed v. Dep't of Transp.,* 872 A.2d 202, 206 (Pa.Cmwlth.2005). *See also Leventhal,* 518 Pa. at 243, 542 A.2d at 1333.

The record amply supports common pleas' findings. Testifying for the Authority, Warren Marr agreed with the hoteliers' expert, Bruce Walker, that the Erie hotel marketplace has enjoyed "an extremely

high level of occupancy ... this is a healthy market." N.T. January 31, 2006, at 123. R.R. 123a. Marr and Walker agreed that Erie has historically been undersupplied with luxury hotel rooms. N.T. February 3, 2006, at 87, R.R. 850A. Walker stated that, in view of the unmet demand in Erie for luxury hotel rooms, new hotels will likely be built in Erie regardless of whether the convention center/host hotel complex is constructed, i.e., the hoteliers will face additional business competition even if the host hotel is not built. Marr opined that the host hotel, as a full service hotel associated with a frequent flier program, would induce additional demand in the Erie market beyond the demand induced by the convention center meeting facilities alone. N.T. February 3, 2006, at 87, 93, R.R. 850a, 856a. Marr agreed that the host hotel would inevitably compete with existing hotels of its class but, even allowing for a minor one-to-four-year drop in occupancy rates during construction and initial operation of the convention facilities and hotel, the general health of the Erie hotel market, along with the increased demand created by the convention center, including its component hotel, and increased demand created by the use of the authorized portion of tax revenues for the general promotion of tourism, would result in a complete rebound by year five to occupancy rates in the plaintiff hotels as strong as prior to the opening of the host hotel. Specifically, after reviewing the basis for his assessment of the Erie hotel market and his projections as to the host hotel's effect on this market, Marr testified:

> Q. From this standpoint, based upon this information and the estimation that you did, the projections that you did, do you have an opinion as to whether the introduction of the Sheraton will result in harm to the market ADR [average daily rate] in the competitive set?

> A. It's my opinion, there will be no prolonged effect. There may be initial impact on ADR for the first year or two, but no prolonged effect on market ADR's.

> Q. Do you have an opinion on whether what we've described as the competitive set, whether it's ADR will increase through the year of stabilization for the Convention Center project, 2011?

> A. Yes, I do have it increasing.

> Q. Let me go back and ask you the same question about the occupancy rates. Do you have an opinion as to whether the introduction of the Sheraton Hotel will result in harm to the occupancy rates of the competitive set within the Erie market?

> A. I believe there will be an initial impact on occupancy, and within a couple years will stabilize back out, and there will be no impact. So no long term impact.

> Q. Do you have an opinion as to whether the introduction of the Sheraton would result in more room nights sold at the period of stabilization, than would occur in the year prior to the introduction of the Convention Center and the Sheraton?

> A. Yes, I believe there will be more room nights sold.

N.T. February 3, 2006, at 116–17, R.R. 879a–880a. This testimony negates the hoteliers' theory of undue economic burden based on unfair market competition from the host hotel.

Common pleas appropriately rejected the plaintiffs' argument that the public funding and ownership of the host hotel must yield a different result than in *Bold Corp.*, which upheld a room tax for the development of the Lancaster Convention Center and its adjoining privately funded host hotel. In *Bold Corp.*, the Court, in

explaining that common pleas had properly considered the impact of the entire convention center project, convention facility and host hotel in determining whether the benefits and burdens were disproportionate, quoted from common pleas' opinion:

> The Court is satisfied that the connection between the convention center and the adjoining hotel is so *quid pro quo* that each must be considered in the benefit/burden analysis.... In other words, the convention center will not be built without the hotel, and vice-versa. If the hotel were to take any and all benefit from the convention center leaving nothing for the other Lancaster County hoteliers, that would appear to be funding of competition in that a benefit would be created for one, through a tax on all. To the extent that there are room nights put back into the market above and beyond this absorption of the convention center business, *that* is merely capitalism at work. Even though the hotel will not come without the convention center, the hotel is not to be funded with public monies. Thus, the plaintiffs are not funding the hotel that will adjoin the proposed convention center. The added competition to the market as a whole is not a concern of the Court, and neither is it relevant to this issue, as the addition of rooms to the market is no different than if any private hotel were to be built in downtown Lancaster. The only relevant burden this hotel will have is the extent to which it takes away the benefits of the convention center from the other Lancaster county hotels.

*Id.* at 118, 801 A.2d at 475 (quoting common pleas op. at 11). That the plaintiff hoteliers in *Bold Corp.* were not funding the host hotel was not the determinative factor in upholding the tax. Rather, the determinative factor, in *Bold Corp.* and in the present case, is whether the plaintiffs established that they will not derive a sufficient business benefit from enjoying a share of the demand for hotel rooms induced by the new convention center. In *Bold Corp.*, the benefit/burden inquiry focused on whether the private host hotel would absorb all of the additional room nights generated by the convention center meeting facilities leaving no benefit to be had by the taxed hoteliers, and the court found that it would not. In the present case, the court's inquiry appropriately looked not only to whether the host hotel will absorb all of the new demand generated by the convention meeting facilities, and found that it would not, but also looked to whether the convention center, as that term is now statutorily defined as including both the meeting facilities and host hotel, will induce sufficient new demand to confer a benefit on the hoteliers, and found that it will. The testimony supports the finding that the host hotel alone will induce additional demand beyond that induced by only a convention meeting facility.

There is no authority for the proposition that tax subsidized competition from a public entity that intrudes on the profits of private enterprise is per se improper. To the contrary, in *Pittsburgh v. Alco Parking Corp.*, 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974), the United States Supreme Court rejected such a contention. In *Alco Parking*, operators of off-street parking lots sought to invalidate a tax on parking fees collected only by the private lot owners and not on parking spaces owned by the public parking authority. Pennsylvania's Supreme Court invalidated the tax deeming it unreasonably high and concluding that, inasmuch as the private operators faced price competition from the publicly subsidized parking authority lots, "where such an unfair competitive advantage accrues, generated by the use of public funds, to a local government at the

expense of private property owners, without just compensation, a clear constitutional violation has occurred." *Alco Parking Corp. v. City of Pittsburgh*, 453 Pa. 245, 267, 307 A.2d 851, 863 (1973), *rev'd*, 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974). The United States Supreme Court soundly rejected this conclusion, stating:

> We cannot agree that these two considerations, either alone or together, are sufficient to invalidate the parking tax ordinance. The claim that a particular tax is so unreasonably high and unduly burdensome as to deny due process is both familiar and recurring, but the Court has consistently refused either to undertake the task of passing on the reasonableness of a tax that otherwise is within the power of Congress or of state legislative authorities, or to hold that a tax is unconstitutional because it renders a business unprofitable.
>
> ....
>
> [W]e [are not] convinced that the ordinance loses its character as a tax and may be stricken down as too burdensome under the Due Process Clause if the taxing authority, directly or through an instrumentality enjoying various forms of tax exemption, competes with the taxpayer in a manner thought to be unfair by the judiciary. This approach would demand not only that the judiciary undertake to separate those taxes that are too burdensome from those that are not, but also would require judicial oversight of the terms and circumstances under which the government or its tax-exempt instrumentalities may undertake to compete with the private sector. The clear teaching of prior cases is that this is not a task that the Due Process Clause demands of or permits to the judiciary.

417 U.S. at 373, 376, 94 S.Ct. 2291. In a concurring opinion, Justice Powell pointed out that constitutional problems could arise at the extreme scenario where "punitive taxation of a private industry and direct economic competition through a governmental entity enjoying special competitive advantages would effectively expropriate a private business for public profit. Such a combination ... would be the functional equivalent of a governmental taking of private property for a public use...." *Id.* at 379, 94 S.Ct. 2291. The present plaintiffs have not demonstrated anything approaching the extreme scenario contemplated by Justice Powell and, under the principles set forth by the majority, the plaintiffs' general objection to a publicly funded competitor does not justify the relief they seek.

Accordingly, we affirm.

### ORDER

AND NOW, this 22nd day of August, 2007, the order of the Court of Common Pleas of Erie County in the above captioned matter is hereby AFFIRMED.

### DISSENTING OPINION BY Judge SMITH–RIBNER.

I respectfully dissent because I conclude that Appellants Kelly M. and Demaris L. Edwards et al. (hereafter "Hoteliers") are correct that the hotel room rental tax (Hotel Tax) provision of the Third Class County Convention Center Authority Act (Alternative Provision), Act of August 9, 1955, P.L. 323, *as amended,* added by Section 2 of the Act of October 18, 2000, P.L. 541, 16 P.S. §§ 2399.51–2399.73(Act), is unconstitutional as applied to them under the circumstances of this case and that the Court of Common Pleas erred in evaluating the evidence regarding burdens and benefits resulting from the publicly funded luxury host hotel as an integral part of the convention center development. The evidence submitted by Appellees Erie County Con-

vention Center Authority et al. (Authority) demonstrates that the burden imposed on the Hoteliers by this tax is palpably disproportionate to any benefit that they received.

First, I agree with the Hoteliers that the fact that the Hotel Tax is available to fund construction and operation of a competing hotel is a crucial distinction from other cases. The original conception of the current Act and of the initial version enacted in 1994 [1] was straightforward and eminently sensible. Convention centers, if they are successful, attract conventions. Conventions are attended by conventioneers, many or even all of whom are from outside the immediate area and who therefore require hotel accommodations in order to attend. This increased demand for hotel rooms is one of the principal economic benefits that flow from the creation of a convention center, and it justifies a presumption, indeed a legislative finding, that the convention center will benefit the local hotel industry.[2] The presumption in turn justifies imposing a hotel room rental tax to assist in financing the project. This construct is stood on its head when a publicly funded luxury hotel is created as an integral part of the convention center project.

As the majority acknowledges, Pennsylvania law recognizes that a hotel room rental tax may be constitutionally unsound in particular circumstances. In *Allegheny County v. Monzo*, 509 Pa. 26, 500 A.2d 1096 (1985), the owner of a hotel on the outskirts of Allegheny County challenged the one percent hotel room rental tax imposed county-wide to finance the construction of a convention center in Pittsburgh under Section 1970.2 of the Second Class County Code, Act of July 28, 1953, P.L. 723, *as amended,* added by Section 1 of the Act of December 16, 1977, P.L. 323, 16 P.S. § 4970.2. The hotel owner argued that a convention center in downtown Pittsburgh would benefit nearby hotels to a great degree, but it would not benefit those farther away, such as his.

The Supreme Court stated: "Where the benefit received and the burden imposed is palpably disproportionate, a tax is not only a taking without due process under the Fourteenth Amendment to the United States Constitution, but also an arbitrary form of classification in violation of equal protection and state uniformity standards." *Monzo,* 509 Pa. at 38, 500 A.2d at 1102. Further, the court explained that hotels in surrounding municipalities were required to collect and pay a tax that provided no benefit to that portion of the class but that enabled Pittsburgh hotels and businesses near the convention center to benefit immeasurably, stating that the owner's hotel "in essence, is being required to finance its competition." *Id.* at 42, 500 A.2d at 1104. The court held that under those circumstances the tax violated the requirement of Article VIII, Section 1 of the Pennsylvania Constitution that taxes "be uniform upon the same class of subjects...."

The Hoteliers emphasize that this case is the first in a line of cases beginning with *Monzo* involving challenges to hotel room rental taxes that includes a publicly funded and publicly owned host hotel that is to be constructed as an integral part of the pro-

---

1. The Third Class County Convention Center Authority Act, Act of December 27, 1994, P.L. 1375, *formerly* 16 P.S. §§ 13101–13124, repealed by Section 4 of the Act of November 3, 1999, P.L. 461.

2. *See* Section 2399.52 of the Act, which states in part: "(a) It is hereby determined and declared as a matter of legislative finding: ... (5) That the development of a convention center will provide benefits to the hotel industry throughout the entire area of the county where the center is developed."

ject in which the convention center is built. Further, this is the first case to consider the amendment to the definition of "convention center" or "convention center facility" in Sections 2399.53 and 2399.72(k) of the Act, 16 P.S. §§ 2399.53 and 2399.72(k), by Section 2 of the Act of November 29, 2004, P.L. 1275 (Act 155), to add the word "hotels" to a definition that plainly did not include hotels as parts of convention centers previously.[3] The majority refers to this amendment but does not mention the fact that the Authority sought and secured it in the course of arranging for bonds backed by Erie County to finance the construction of the convention center and the hotel.

The effect of the amendment is to permit money collected through the Hotel Tax authorized by the Act to be available for any aspect of the construction or operation of the Host Hotel as well as the convention center, including debt service and operational expenses. Curiously, the Authority asserts that it has a policy of not using Hotel Tax revenues for such hotel purposes (and that Hotel Tax revenues used for initial "soft" costs including design charges were repaid as soon as the bonds were issued), as if the Authority is aware of the inherent unfairness of taxing an existing hotel to finance construction and operation of a competing hotel. The Act, as amended, however, requires no such restraint.

The recent case of *Bold Corp. v. County of Lancaster*, 569 Pa. 107, 801 A.2d 469 (2002), was somewhat similar to the present case in that a host hotel was to be built along with the convention center, with the distinction that the hotel was to be privately financed and owned. As the majority notes, the Supreme Court quoted the trial court's opinion at length:

The plaintiffs complain that the Court dismissed the general effect of the hotel portion of the project as merely capitalism at work. This, however, is not the Court's position, which was better articulated during the oral argument on this issue. The Court is satisfied that the connection between the convention center and the adjoining hotel is so *quid pro quo* that each must be considered in the benefit/burden analysis. However, the hotel is only relevant to the extent that it takes away any benefit from the plaintiffs that would be derived from the convention center. In other words, the convention center will not be built without the hotel, and vice-versa. If the hotel were to take any and all benefit from the convention center leaving nothing for the other Lancaster County hoteliers, that would appear to be a funding of competition in that a benefit would be created for one, through a tax on all. *See generally* [*Monzo*]. To the extent that there are room nights put back into the market above and beyond this absorption of the convention center busi-

---

**3.** The definitions in both sections provide in relevant part, with added emphasis:

"Convention center" or "convention center facility" shall mean any land, improvement, structure, building, or part thereof, or property interest therein, whether owned by or leased by or to or otherwise acquired by an authority, appropriate for any of the following: large public assemblies, the holding of conventions, conferences, trade exhibitions and other business, social, cultural, scientific, sports, recreational, artistic

and public interest events, performances and exhibitions, and all facilities, furniture, fixtures and equipment necessary or incident thereto, including *hotels*, meeting rooms, dining rooms, kitchens, ballrooms, reception areas, registration and prefunction areas, locker rooms, practice areas and equipment, training areas and equipment, truck loading areas ... and also including other land, buildings, structures or facilities for use or planned for use in conjunction with the foregoing....

ness, *that* is merely capitalism at work. Even though the hotel will not come without the convention center, *the hotel is not to be funded with public monies. Thus, the plaintiffs are not funding the hotel that will adjoin the proposed convention center. The added competition to the market as a whole is not a concern of the Court, and neither is it relevant to this issue, as the addition of rooms to the market is no different than if any private hotel were to be built in downtown Lancaster. The only relevant burden this hotel will have is the extent to which it takes away the benefits of the convention center from the other Lancaster County hotels.*

*Id.*, 569 Pa. at 118, 801 A.2d at 475 (quoting Trial Court slip op. at 11) (second emphasis added). The majority concludes that the fact that the host hotel was not funded by the tax on the hoteliers was not the determinative factor; rather, the inquiry focused on whether the hotel would absorb all of the additional room nights.

The language emphasized above plainly indicates that the reason that the court could consider the extent to which the host hotel would take away the benefits of the convention center as the "only relevant burden" and why the host hotel there was "no different than if any private hotel were to be built in downtown Lancaster" was precisely because the hotel was not being financed by the proceeds of the hotel room rental tax. In the present case the collection of the Hotel Tax from the Hoteliers and making that money available for funding all aspects of the competing Host Hotel must be considered as part of the "relevant burden" on the Hoteliers, as well as the adverse impact that the operation of the Host Hotel is conceded to have on the Hoteliers' business. Further, the fact that the Hoteliers are being required to fund a competing hotel as part of this project necessarily undercuts the finding in Section 2399.52(a)(5) of the Act that the development of the convention center will provide benefits to the hotel industry. The trial court's opinion relied heavily on this finding, which has been altered by Act 155.

The second aspect of the burden imposed is the extent, if any, to which the Host Hotel will draw business away from the existing hotels. The trial court stated that neither side presented compelling support for its position; however, on balance, the court found the testimony of the Authority's witnesses Warren Marr and Robert Canton, both of Pricewaterhouse-Coopers, and Charles H. Johnson, real estate development consultant, to be more grounded in fact than supposition and their conclusions to be the result of a more comprehensive, well-reasoned and objective analysis. The Authority's witnesses and the Authority's argument focus on increase in demand for hotel rooms resulting from the construction of the convention center and, according to Marr, from the construction of the Host Hotel, which, as a new luxury hotel in this market would generate its own demand of 5000 additional room nights per year.

Marr testified that he believed that the convention center would generate between 24,000 and 32,000 room nights per year within five years of opening, of which 50 percent would be accommodated by the Host Hotel and 50 percent by other hotels. Net occupancy would decline from 68 percent to 65 percent in 2008, but then recover. By 2011, he opined, the convention center and hotel complex would reach "stabilization," and any detrimental effect on local occupancy rates within the hotel's competitive market segment would have dissipated, *i.e.*, the overall occupancy rate would return to 68 percent. Further, there would be benefits for the community at large due to construction spending, the

economic impact of many new visitors and additional revenue for the work of the Convention and Visitors Bureau (CVB). Johnson testified that stabilization would occur after six years and that by then the convention center would generate between 18,000 and 35,000 additional room nights per year.

The majority quotes Marr's testimony stating that his projections were that there might be an initial adverse impact on the average daily rate (ADR) charged by other hotels in the competitive set for a year or two but no prolonged effect and that the ADR would increase through the 2011 year of stabilization. N.T., February 3, 2006, pp., 116–117; Reproduced Record (R.R.) 879a–880a. Similarly, he stated that the introduction of the Host Hotel would result in initial harm to the occupancy rates of the hotels in the competitive set, but that again it would "stabilize out" in a couple of years and there would be no long-term impact. *Id.* at 117; R.R. 880a. In concluding that the testimony negated the Hoteliers' theory of undue economic burden based on unfair market competition from the Host Hotel, the majority simply accepts that several years of admitted adverse effects on rates and occupancy levels of competitive hotels are of no significance.

The Hoteliers focus on the competitive effect of increased supply of high-end but moderately priced rooms. They calculate that to achieve a 68 percent occupancy rate, the Host Hotel will need to capture 31,820 room nights from existing businesses. Even assuming that Marr and Canton are correct that other hotels will receive 13,500 new room nights, there is still a net loss of 18,320 room nights, or over $1,600,000 annually, which they assert is a "palpable" burden. The Authority does not fully agree with the calculation, but it acknowledges a harmful effect.

Further, the Hoteliers point out that Marr's testimony was based on an assumption that there would be no other new sources of supply, *i.e.,* new hotels, for seven years, but it was announced during trial that another new hotel was to be built in Erie County.

Robert J. O'Malley, the Authority's Executive Director, acknowledged that the cost of money is less for a tax-exempt entity, N.T., February 2, 2006, p. 71; R.R. 538a, and that an authority-owned hotel is able to moderate prices because its only objective is to cover debt service and to maintain the facility, not to maximize profits, *id.* at p. 75; R.R. 542a. These represent permanent competitive advantages that will be enjoyed by the Host Hotel. As for the Authority's "policy" of not using Hotel Tax money to support the operations of the Host Hotel, the Hoteliers note that policies may change and that it is unrealistic to expect that the Authority would not use this money for hotel debt service if the hotel's earnings declined. Such a change in policy is highly likely, if needed, in view of the Authority's efforts in securing the adoption of Act 155.

Arrayed against this evidence of burden is the largely speculative evidence of possible benefit to the Hoteliers. Marr's testimony quoted by the majority speaks only of an eventual return to the 68 percent occupancy rate that he said would exist if no convention center were built; it does not claim higher future occupancy levels. Although he stated that more rooms would be sold after stabilization, that is a given in view of the addition of new rooms to the market; he did not state or imply that the Hoteliers would sell more rooms than before. The trial court accepted that additional revenue to the CVB improved its position to meet its objectives and to enhance business for the entire County hotel industry; however, the Hoteliers do not

challenge the 20 percent of the Hotel Tax that is dedicated to the CVB.[4]

Finally, I agree that the trial court erred in considering benefits to the community in general as part of the benefit/burden analysis. As they note, the trial court's supplemental opinion stated that Marr's "forecast with regard to a temporary adverse effect in the overall hotel market must be seen in the context of the larger picture regarding the impact of the convention center on the Erie County community." Trial Court Supplemental Opinion, p. 5. It listed factors including a direct economic impact of $64,000,000 in construction costs, the addition of 780 employees, the prospect of many new visitors and secondary impacts such as downtown revitalization. As the majority notes, the Supreme Court explained in *Monzo* that because the hotel tax did not qualify as one for general public use, such as taxes imposed for the benefit of public schools, the general rule that a challenger cannot prevail on the ground that he or she receives no benefit does not apply. As the Hoteliers stress, the court stated that "in classifying persons for taxation, there is an obligation on the part of the taxing power to make available some benefit *to those taxed.*" *Monzo*, 509 Pa. at 39–40, 500 A.2d at 1103 (emphasis added).

None of the several cases that have considered the question of the legitimacy of a hotel rental room tax has considered bene-

fit to the community as a whole as a part of the benefit/burden analysis. *See, e.g., Bold Corp.; Leventhal v. City of Philadelphia,* 518 Pa. 233, 542 A.2d 1328 (1988). The reason, I conclude, is obvious: the community as a whole is not being asked to pay the tax. Rather, a narrow classification of hoteliers is being required to assess the tax on patrons and to pay the tax. The consideration of benefits and burdens must be limited to the effect on those subject to the tax.

In conclusion, I agree with the Hoteliers that the fact that this case involves a publicly funded and publicly owned Host Hotel, with access to Hotel Tax revenues permitted by Act 155, at a minimum invalidates that legislative finding that a new convention center will benefit the county hotel industry. I think that the Hoteliers have demonstrated a substantial burden from the tax, palpably disproportionate to any proposed benefit and sufficient to require invalidation of the tax as applied to them. Accordingly, I dissent from the majority's decision and would reverse the order of the trial court.

---

4. The Hoteliers have stated repeatedly that they do not challenge the 20 percent of the Hotel Tax that is dedicated to the CVB, and each count of the Second Amended Complaint states a request for relief including an order to the City and County of Erie to make restitution to Hoteliers "in the form of a refund of 80% of all Hotel Room Excise Taxes collected from them by the County." Second Amended Complaint in Equity and Action for Declaratory Judgment, ¶¶ 114, 116, 122 and 124; R.R. 1020a, 1022a, 1023a and 1025a. Cases are clear that where a controversy in-

volves a challenge to the constitutional validity of a taxing statute or ordinance, such a controversy falls within the general class of cases where equity has jurisdiction and competence to act. *Studio Theaters, Inc. v. Washington,* 418 Pa. 73, 209 A.2d 802 (1965). Further, once its jurisdiction has been established, equity may fashion relief as justice and good conscience dictate. *Tredyffrin–Easttown School District v. Valley Forge Music Fair, Inc.,* 156 Pa.Cmwlth. 178, 627 A.2d 814 (1993).